1
2
3
4                       UNITED STATES DISTRICT COURT
5                     NORTHERN DISTRICT OF CALIFORNIA
6
7    DENNIS M. LORENZ,                     Case No.  16-cv-04903-JST
              Plaintiff,
8
                                           **ORDER GRANTING IN PART AND**
9        v.                                **DENYING IN PART MOTIONS TO**
                                           **DISMISS**
10   SAFEWAY, INC., et al.,
                                           Re: ECF Nos. 36, 38
              Defendants.
11
12          Before the Court are Defendants' motions to dismiss.  The Court will grant the motions in

13   part and deny them in part.

14   **I.      BACKGROUND**

15          For the purpose of deciding this motion, the Court accepts as true the following allegations

16   from Plaintiff's Second Amended Complaint ("SAC"), ECF No. 31.  See Navarro v. Block, 250

17   F.3d 729, 732 (9th Cir. 2001).

18          **A.      Parties**

19          Plaintiff Dennis M. Lorenz participates in Safeway's 401(K) Plan ("the Plan").  ECF No.

20   31 ¶ 8.  Defendant Safeway, Inc. sponsors the Plan, and Defendant Safeway Benefit Plans

21   Committee administers the Plan (collectively "Safeway Defendants").  Id. ¶¶ 10-11.  Defendant

22   Great-West Financial RPS LLC d/b/a Empower Retirement ("Great-West") began providing

23   record-keeping services for the Plan in September 2014 when it acquired the record-keeping

24   business from JP Morgan Retirement Plan Services, and stopped providing recordkeeping services

25   for the Plan in July 2016.  Id. ¶¶ 12-14.

26          **B.      Master Services Agreement**

27          On January 1, 2009, the Safeway Defendants entered into a master services agreement to

28

United States District Court
Northern District of California

1   compensate JP Morgan Retirement Plan Services for its provision of recordkeeping services.  ECF

2   No. 37-2.  Great-West continued to operate under that agreement when it acquired JP Morgan

3   Retirement Plan Services' record-keeping business in September 2014.  SAC, ECF No. 31 ¶¶

4   12-14, 25; ECF No. 37-6 at 2 (amendment to the master services agreement).

5           Pursuant to the master services agreement, the Plan agreed to compensate the record-

6   keeper through a "Contingent Per Participant Fee" of $67 per year.  ECF No. 37-2 at 22.  This fee

7   was lowered to $65 per year in 2011.  ECF No. 37-4.  Under this arrangement, the record-keeper

8   would initially receive a percentage of the fees charged for each investment as a credit toward

9   record-keeping services.  ECF No. 37-2 at 22, 30.[1]  If the service fees that the record-keeper

10  received for a particular quarter fell below one-quarter of the annual per-participant fee, Safeway

11  was required to "make a lump sum payment to [the record-keeper] … in an amount equal to the

12  difference between the foregoing amount and the amount of the actual annual service fees received

13  by [the record-keeper]."  Id. at 22.  Conversely, "[i]n the event the annual service fees received by

14  [the record-keeper] exceed $65.00 per Participant at the end of the Plan Year, [the record-keeper]

15  shall accumulate accruals under the Plan Expense Arrangement ("PEA") in accordance with the

16  terms and conditions of the PEA Addendum to the Agreement."   ECF No. 37-4 at 2-3; see also

17  ECF No. 37-2 at 42 ("Accruals will be calculated and attributed to the PEA at the end of each

18  calendar quarter for all service fees received by [the record-keeper] related to . . . investments in

19  the Plan in excess of the applicable Contingent Per Participant Fee . . .").  The excess funds in the

20  PEA account could only be used at the direction of the Safeway Defendants to reasonably

21  compensate third-party service providers, in accordance with ERISA.  ECF No. 37-2 at 38, 39-40.

22  Any accruals in the PEA account "expire at 3:00 p.m. Central Time on the last business day, as

23  determined by JPMorgan RPS, of each subsequent Plan Year, or upon the termination of the

24  Agreement or this Addendum."  ECF No. 37-2 at 38.

25           On November 1, 2013, the Safeway Defendants and the record-keeper amended the master

26

27  [1] Where a record-keeper recovers administrative costs from Plan participants in this way—that is,
    by assessing asset-based fees against the various investment options—it is sometimes referred to
28  as asset-based revenue sharing.  White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 WL
    4502808, at *14 (N.D. Cal. Aug. 29, 2016).

2

services agreement to replace the PEA with an "ERISA Spending Account."  ECF No. 37-5 at 2, 4-6.  Pursuant to that amendment, any service fees that exceeded the annual per participant fee at the end of the Plan year would be attributed to the Plan's ERISA Spending Account.  Id. at 2. Unlike the PEA addendum that it replaced, the ERISA spending account addendum does not state that these excess accruals expire.  See id.  The ERISA spending account addendum also provides that, "[i]n the event Plan Sponsor does not exhaust the Account for a given calendar quarter, Plan Sponsor may allocate such eligible unused amounts, held in the Account to Participant accounts." Id. at 5.

### C.      JP Morgan Target Date Funds

Between 2011 and July 2016, the Plan offered several target date funds[2] managed by JP Morgan Chase Bank.  SAC, ECF No. 31 ¶ 18.  These funds, which are called "JPMCB Smartretire Passiveblend" funds, were offered in five-year intervals (e.g., "JPMCB Smartretire Passiveblend 2015" and "JPMCB Smartretire Passiveblend 2020"), where the target year corresponds with the participant's anticipated retirement age.  Id. ¶¶ 16, 18.  Lorenz chose to invest his retirement savings in the JPMCB Smartretire Passiveblend 2020 Fund.  Id. ¶ 8.

### D.      Second Amended Class Action Complaint

In this putative class action, Lorenz asserts two claims against the Safeway 401(K) Plan's fiduciaries and parties in interest under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.  SAC, ECF No. 31.[3]

First, Lorenz alleges that the Safeway Defendants breached their fiduciary duty of prudence by: (1) selecting funds that charged higher fees than comparable, readily-available funds, and which had no meaningful record of performance so as to indicate that higher performance would offset this difference in fees; and (2) entering into and maintaining a revenue-sharing

---

[2] According to Lorenz's complaint, "[t]arget date funds are investment funds designed to allow retirement plan participants to invest in a single fund with a professionally-managed, broadly-diversified portfolio that becomes more conservative as the participant approaches retirement age, typically by shifting the proportion of the fund investing in stocks as compared to bonds."  SAC, ECF No. 31 ¶ 16.

[3] This Court previously related this action to another action pending in this district, Maria Karla Terraza v. Safeway, Inc., et al., Case No. 16-cv-03994, which asserts similar claims.  ECF No. 26.

United States District Court
Northern District of California

1    agreement with the Plan's record-keepers (JP Morgan Retirement Planning Services and later

2    Great-West) that resulted in excessive compensation to those entities.  SAC, ECF No. 31 ¶¶ 66-73.

3          Second, Lorenz claims that the revenue-sharing agreement constituted a prohibited

4    transaction under ERISA for which the Safeway Defendants (as fiduciaries) and Great-West (as a

5    party in interest) are both liable.  Id. ¶¶ 74-77.

6          As relief, Lorenz seeks reimbursement from the Safeway Defendants for all losses

7    resulting from their breaches of fiduciary duty, as well as reimbursement from both the Safeway

8    Defendants and Great-West for any compensation received as a result of transactions prohibited

9    by ERISA.  Id. at 18-19.

10         Lorenz seeks to certify a class of "[a]ll participants in any employee benefit plan governed

11   by ERISA who invested in the JPM Smartretire Passiveblend Funds from 2011 to the present

12   where JPMRPS/Great-West served as the recordkeeper for the plan and received an asset-based

13   revenue sharing payment in connection with the JPM Smartretire Passiveblend Funds."  Id. ¶ 53.

14   He also proposes a Safeway Subclass, which would include "[a]ll participants in the Plan who

15   invested in any of the JPM Smartretire Passiveblend Funds from the time these funds were first

16   offered by the Plan in 2011 until they ceased to be offered in the Plan in July 2016."  Id.

## II.    JURISDICTION

17

18         The Court has subject matter jurisdiction over Plaintiff's claims under 29 U.S.C.

19   § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

## III.   REQUESTS FOR JUDICIAL NOTICE

20

21         Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that

22   is not subject to reasonable dispute because it: (1) is generally known within the trial court's

23   territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

24   accuracy cannot reasonably be questioned."  The Court may also "consider materials incorporated

25   into the complaint," where "the complaint necessarily relies upon a document or the contents of

26   the document are alleged in a complaint, the document's authenticity is not in question and there

27   are no disputed issues as to the document's relevance."  Coto Settlement v. Eisenberg, 593 F.3d

28   1031, 1038 (9th Cir. 2010).  This is true even if the plaintiff does not explicitly allege the contents

United States District Court
Northern District of California

1  of that document in the complaint.  Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005).  The

2  Court "must take judicial notice if a party requests it and the court is supplied with the necessary

3  information."  Fed. R. Evid. 201(c)(2).

4        The Safeway Defendants request that the Court take judicial notice of several Plan-related

5  documents from the relevant time period, including the Safeway Plan itself, the summary plan

6  descriptions, Form 5500 filings submitted to the Department of Labor, participant fee disclosure

7  notices, the master services agreement between Safeway and JP Morgan Retirement Plan Services,

8  and the 2011 amendment to that master services agreement.  ECF No. 40.  In addition, the

9  Safeway Defendants request that the Court take judicial notice of the definition of a collective

10  investment fund, which is publicly available on the Investopedia website.  Id.  Great-West also

11  requests that the Court take judicial notice of the master services agreement between Safeway and

12  JP Morgan Retirement Plan Services (later between Safeway and Great-West), as well as

13  subsequent amendments to those documents.  ECF No. 37.

14        The Court takes judicial notice of the Plan-related documents because the Plaintiff's

15  complaint incorporates each of those documents by reference, the complaint necessarily relies on

16  those documents, and neither party questions their authenticity or relevance.  Courts routinely take

17  judicial notice of ERISA plan documents like those at issue here.  See, e.g., Watkins v. Citigroup

18  Ret. Sys., No. 15-CV-731 DMS (NLS), 2015 WL 9581838, at *2 (S.D. Cal. Dec. 30, 2015)

19  (taking judicial notice of a pension plan); Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth

20  Grp., Inc., 99 F. Supp. 3d 1110, 1126 (C.D. Cal. 2015) (taking judicial notice of Form 5500

21  filings).

22        In addition, the Court takes judicial notice of the definition of a collective investment fund,

23  which is publicly available on the Investopedia website.  Plaintiff does not oppose this request or

24  otherwise contend that the document is inaccurate.  Perkins v. LinkedIn Corp., 53 F. Supp. 3d

25  1190, 1204–06 (N.D. Cal. 2014) (taking judicial notice of publicly accessible websites).

26  **IV.    MOTION TO DISMISS**

27        Defendants move to dismiss Lorenz's complaint on the following grounds: (1) the claims

28  are untimely; (2) Lorenz has failed to state a claim for breach of fiduciary duty because the

United States District Court
Northern District of California

5

United States District Court
Northern District of California

expense ratios of the JP Morgan Smartretirement Passiveblend funds were reasonable as a matter of law and Great-West was not compensated through a revenue-sharing agreement, but rather through a per-participant fee; (3) Lorenz has failed to state a prohibited transaction claim because the transaction was exempt under ERISA; (4) even if Lorenz has stated a prohibited transaction claim, he lacks constitutional standing to bring such claim; and (6) the Plaintiff may not seek monetary damages against Great-West because it is a party in interest, not a fiduciary.  ECF No. 38 at 7-10; ECF No. 36 at 7-9.[4]

### A.       Legal Standards for Motions to Dismiss under Rules 12(b)(1) and 12(b)(6)

A motion to dismiss under Rule 12(b)(1) tests the subject matter jurisdiction of the Court.  See Fed R. Civ. P. 12(b)(1).  If a plaintiff lacks Article III standing to bring a suit, the federal court lacks subject matter jurisdiction and the suit must be dismissed under Rule 12(b)(1).  Cetacean Cmty. v. Bush, 386 F.3d 1169, 1174 (9th Cir. 2004). "A Rule 12(b)(1) jurisdictional attack may be facial or factual.  In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).  In resolving a facial attack, the court assumes that the allegations are true and draws all reasonable inferences in the plaintiff's favor.  Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004) (citations omitted).  A court addressing a facial attack must confine its inquiry to the allegations in the complaint. See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cty., 343 F.3d 1036, 1051 (9th Cir. 2003).

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  While a complaint need not contain detailed factual allegations, facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). To

---

[4] The Defendants in the related case, Terraza v. Safeway, Inc. et al., Case No. 16-cv-03994, filed a motion to dismiss that addresses overlapping factual and legal issues.  Portions of this order are identical to portions of the order in that case.

survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, states a claim that is plausible on its face.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.  While this standard is not a probability requirement, "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."  Id. (internal quotation marks omitted).  In determining whether a plaintiff has met this plausibility standard, the Court must accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the plaintiff.  Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005).

### B.    Standing

Great-West argues that Lorenz lacks constitutional standing to bring a prohibited transaction claim because he has not yet advanced "a plausible theory that Great-West's actual compensation was excessive."[5]  ECF No. 36 at 8.  As a result, Great-West argues, Lorenz has not suffered any concrete harm, and "the mere existence of a technical violation of ERISA is not enough to establish Article III standing."  ECF No. 36 at 8.

To have the requisite constitutional standing to bring a suit in federal court, a plaintiff must (1) have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016), as revised (May 24, 2016) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-561 (1992)).  To establish an injury in fact, a plaintiff must show that he suffered a "concrete" (i.e., "real") injury that "affect[ed] the plaintiff in a personal and individualized way."  Id. at 1548 (quoting Lujan, 504 U.S. at 560) (internal quotation marks omitted)).

"The Supreme Court has made clear that when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."  Parker v.

---

[5] The prohibited transaction claim is the only claim brought against Great-West, and the Safeway Defendants do not argue that Lorenz lacks standing to pursue his breach of fiduciary duty claim.

United States District Court
Northern District of California

D.C., 478 F.3d 370, 377 (D.C. Cir. 2007), aff'd sub nom. D.C. v. Heller, 554 U.S. 570 (2008) (citing Warth v. Seldin, 422 U.S. 490, 501-02 (1975)).  And "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  Lujan, 504 U.S. at 561 (1992) (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 889 (1990)).

Applying these principles to the case at hand, the Court finds that Lorenz has adequately alleged a concrete injury sufficient to establish Article III standing.  Lorenz alleges that he invested in the JP Morgan target date funds, that a portion of the amount he invested was used to compensate Great-West, that the compensation was excessive, and that, as a result, he received lower investment returns.  SAC, ECF No. 31 ¶¶ 8, 21, 25, 39.  Regardless of whether Lorenz has advanced a plausible theory that Great-West did in fact receive excessive compensation, the Court assumes the merits of his legal claim for purposes of the standing analysis.  Therefore, Lorenz does not allege a mere technical violation of ERISA; he alleges that the prohibited transaction between the Safeway Defendants and Great-West caused him to suffer real financial injury.

The cases that Great-West cites are inapposite.  Two of the cases do not even address the injury in fact requirement that Great-West argues is lacking here.  See Paulsen v. CNF Inc., 559 F.3d 1061, 1073 (9th Cir. 2009) (holding that plan participants lacked constitutional standing to pursue ERISA breach of fiduciary duty claims because any potential recovery would benefit the plan as a whole, but the plan had already been terminated, so a favorable decision was not likely to redress their claims); Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc., 465 F.3d 1123, 1125 (9th Cir. 2006) (also addressing the likelihood of redressability requirement for Article III standing.  Great-West also cites the Slack decision for the proposition that "Plaintiffs do not have Article III standing to allege an ERISA cause of action for monetary damages simply based on the alleged violation of an ERISA trustee's breach of fiduciary duties."  Slack v. Int'l Union of Operating Engineers, No. C-13-5001 EMC, 2014 WL 4090383, at *12 (N.D. Cal. Aug. 19, 2014).  However, as explained above, Lorenz does not claim to have standing based solely on a statutory violation of ERISA; he claims that the ERISA violation at issue here caused him to

8

1  suffer a concrete financial injury sufficient to confer standing.

2      The Court concludes that Lorenz has standing under Article III.

3      **C.   Timeliness**

4      The Safeway Defendants and Great-West argue that both of Lorenz's claims are untimely.

5  ECF No. 38 at 25-27; ECF No. 36 at 24-26.

6      ERISA requires that an action be commenced within (1) "six years after . . . the date of the

7  last action which constituted a part of the breach or violation, or . . . in the case of an omission the

8  latest date on which the fiduciary could have cured the breach or violation, or (2) "three years after

9  the earliest date on which the plaintiff had actual knowledge of the breach or violation," whichever

10 is earlier.  29 U.S.C. § 1113.  The timeliness analysis therefore hinges on when the alleged breach

11 or violation occurred and when the plaintiff had actual knowledge of the breach or violation.

12 Ziegler v. Connecticut Gen. Life Ins. Co., 916 F.2d 548, 550 (9th Cir. 1990).

13           **1.   Breach of Fiduciary Duty Claim**

14     Lorenz's breach of fiduciary duty claim is timely under both the six-year statute of repose

15 and the three-year statute of limitations.

16     First, the Safeway Defendants' had a continuing duty of prudence that went beyond their

17 initial decision to include the JP Morgan target date funds in 2011 or their initial decision to enter

18 into a revenue-sharing arrangement with the record-keeper in 2009.  See Tibble v. Edison Int'l,

19 135 S. Ct. 1823, 1828–29 (2015) (holding that "[t]he Ninth Circuit erred by applying a 6-year

20 statutory bar based solely on the initial selection of the three funds without considering the

21 contours of the alleged breach of fiduciary duty").  Rather, "a fiduciary normally has a continuing

22 duty of some kind to monitor investments and remove imprudent ones" that "exists separate and

23 apart from the trustee's duty to exercise prudence in selecting investments at the outset." Id.

24 Fiduciaries also have a continuing duty to act prudently in deciding whether to continue a revenue-

25 sharing arrangement with a third-party service provider.  See Employee Benefits Security

26 Administration of the U.S. Department of Labor, Advisory Opinion 2013-03A.  Accordingly,

27 where the plaintiff "allege[s] that a fiduciary breached the duty of prudence by failing to properly

28 monitor investments and remove imprudent ones," the claim is timely "so long as the alleged

United States District Court
Northern District of California

9

1    breach of the continuing duty occurred within six years of suit." Tibble, 135 S. Ct. at 1828-29.

2    Because Lorenz alleges that the Safeway Defendants breached their continuing duty of prudence

3    by retaining the JP Morgan target date funds until 2016 and remaining in the revenue-sharing

4    arrangement, this claim is timely under the six-year statute of repose.

5           Defendants contend that this claim is nevertheless barred under the three-year statute of

6    limitations because the 2011 participant disclosure notice, which Lorenz received no later than

7    2012,[6] gave him actual knowledge of both the JP Morgan target date funds' expense ratios and the

8    revenue-sharing arrangement.  ECF No. 38 at 25-26; ECF No. 36 at 24-25.

9           The Ninth Circuit rejected this exact argument in Tibble I.  729 F.3d at 1120-21.  It held,

10   and the Supreme Court did not disagree on appeal, that "mere notification that retail funds were in

11   the Plan menu falls short of providing 'actual knowledge of the breach or violation'" of the

12   fiduciary duty of prudence.  Tibble I, 729 F.3d at 1121 (quoting Brown v. Am. Life Holdings, Inc.,

13   190 F.3d 856, 859 (8th Cir. 1999)).  The court explained that a breach of the duty of prudence

14   "hinge[s] on infirmities in the selection process for investment" and a failure to investigate

15   alternatives.  Id.  As a result, "[w]hen beneficiaries claim the fiduciary made an *imprudent*

16   investment, actual knowledge of the breach [will] usually require some knowledge of how the

17   fiduciary selected the investment."  Id. (internal quotation marks omitted) (emphasis in original).

18   Although the 2011 participant disclosure notice gave Lorenz notice that the Plan had added the JP

19   Morgan target date funds and entered into a revenue-sharing arrangement with the record-keeper,

20   it did not provide him with actual knowledge regarding the Safeway Defendants' decision to

21   include these investment options or consideration of alternative compensation arrangements.

22   Therefore, the 2011 participant disclosure notice did not trigger the three-year statute of

23   limitations.

24                        **2.      Prohibited Transactions Claim**

25          Lorenz's prohibited transaction claim is time-barred under the three-year statute of

26

27   ──────────────────────
     [6] The Safeway Defendants contend that the 2011 Participant Disclosure Notices were distributed
28   to Lorenz and all other Plan participants no later than 2012, and Lorenz does not dispute this
     contention in his briefing.  ECF No. 38 at 27.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    limitations.

2           Unlike a claim for breach of fiduciary duty, which turns on the prudence of a fiduciary's

3    decision-making process, a violation of Section 1106(a)(1)(C) occurs when "[a] fiduciary with

4    respect to a plan . . . cause[s] the plan to engage in a transaction, if he knows or should know that

5    such transaction constitutes a direct or indirect . . . furnishing of goods, services, or facilities

6    between the plan and a party in interest."  29 U.S.C. § 1106(a)(1)(C).

7           Here, Lorenz had actual knowledge that the Safeway Defendants had caused the Plan to

8    engage in such a transaction for services with its record-keeper no later than 2012, when the 2011

9    Participant Disclosure Notice was available to him.  That disclosure provides that the record-

10   keeper will receive fees from the Plan for its services, and therefore gave Lorenz actual knowledge

11   of the prohibited transaction alleged here.  ECF No. 39-11 at 11.  This is true regardless of

12   whether Lorenz actually read the Participant Disclosure Notice.  Brown v. Owens Corning Inv.

13   Review Comm., 622 F.3d 564, 571 (6th Cir. 2010) ("Actual knowledge does not 'require proof

14   that the individual Plaintiffs actually saw or read the documents that disclosed' the allegedly

15   harmful investments.").  Despite having actual knowledge of the alleged prohibited transaction,

16   Lorenz did not file suit until four years later in 2016.  Therefore, his prohibited transaction claim is

17   untimely under ERISA's three-year statute of limitations.

18          This claim is time-barred regardless of whether the Safeway Defendants had a continuing

19   duty not to engage in prohibited transactions.  Unlike the six-year statute of repose, which turns on

20   "*the date of the last action* which constituted a part of the breach or violation," the three-year

21   statute of limitations "requires the plaintiff's knowledge to be measured from the '*earliest date' on*

22   *which he or she knew of the breach*."  Phillips v. Alaska Hotel & Rest. Employees Pension Fund,

23   944 F.2d 509, 520 (9th Cir. 1991), as amended on denial of reh'g (Dec. 6, 1991) (quoting 29

24   U.S.C. § 1113(a) (emphases added)).  And where, as here, the challenged conduct "may be viewed

25   as "a series of breaches . . . of the same character," "[t]he earliest date on which a plaintiff became

26   aware of any breach would thus start the limitation period of § 1113(a)(2) running."  Id.

27          Because Lorenz's prohibited transaction claim is untimely under the three-year statute of

28   limitations, the Court need not address whether it is timely under the six-year statute of repose.

See 29 U.S.C. § 1113 (requiring that an action be commenced "after the earlier of" the six-year statute of repose or the three-year statute of limitations).  The Court further concludes that amendment would be futile, and accordingly grants the motion to dismiss this claim without leave to amend.  Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990) ("It is not an abuse of discretion to deny leave to amend when any proposed amendment would be futile.").[7]

### D.    Failure to State a Claim for Breach of Fiduciary Duty

The central purpose of ERISA is to "protect the interests of participants in employee benefit plans and their beneficiaries."  Schikore v. BankAmerica Supplemental Ret. Plan, 269 F.3d 956, 963 (9th Cir. 2001) (quoting 29 U.S.C. § 1001(b)).  To that end, ERISA requires that a pension plan fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

Under this "prudent person" standard, courts must determine "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment."  Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983).  The prudence analysis "focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results."  In re Unisys Sav. Plan Litig., 74 F.3d 420, 434 (3d Cir. 1996).  "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific."  Fifth Third Bancorp v. Dudenhoeffer, 134 S. Ct. 2459, 2471 (2014) (quoting 29 U.S.C. § 1104(a)(1)(B)).  This duty of prudence extends to both the initial selection of an investment and the continuous monitoring of investments to remove imprudent ones.  Tibble v. Edison Int'l, 135 S. Ct. 1823, 1828-29 (2015).

To state a claim for breach of fiduciary duty, a complaint does not need to contain factual

---

[7] Because the Court dismisses the prohibited transaction claim as time-barred, it does not need to address whether Lorenz's complaint properly states a prohibited transaction claim or whether Lorenz seeks improper relief against Great-West with respect to that claim.

United States District Court
Northern District of California

allegations that refer directly to the fiduciary's knowledge, methods, or investigations at the relevant times.  Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 718 (2d Cir. 2013).  Even in the absence of such direct allegations, the court may be able to reasonably infer from the circumstantial factual allegations that the fiduciary's decision-making process was flawed.  Id. (quoting Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 596 (8th Cir. 2009)).  After all, "the circumstances surrounding alleged breaches of fiduciary duty may frequently defy particularized identification at the pleading stage."  Concha v. London, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Where a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct.").

### 1.    Excessive Fees

First, Lorenz alleges that the Safeway Defendants breached their duty of prudence by offering the JP Morgan target date funds because "these funds charged higher fees than comparable funds, had no meaningful record of performance so as to indicate that higher performance would offset this difference in fees, and was managed by a company affiliated with the Plan's recordkeeper, [JP Morgan Retirement Planning Services], and trustee, Chase."  ECF No. 31 ¶ 68.  Lorenz alleges that Plan participants who invested in these funds were charged a management fee that was between 47 and 50 basis points—i.e., between 0.47 per cent and .50 per cent of the amount invested—whereas the alternative target date fund offered by Vanguard in 2011 charged a fee of only 15 basis points, or .15 percent of the amount invested.  Id. ¶¶ 21-22.[8] Lorenz further alleges that "the Vanguard target date funds substantially outperformed the comparable JPM Smartretire Passiveblend Funds" between 2010 and 2015.  Id. ¶ 23.  In light of this, Lorenz concludes that, "[h]ad the Safeway Defendants conducted an adequate investigation

---

[8] Lorenz also alleges that the Blackrock Lifepath Index funds, which the Plan began to offer after July 2016, had an expense ratio of only .056 per cent.  Id. ¶ 24.  However, the prudent person standard focuses on the fiduciary's conduct "at the time they engaged in the challenged transactions," so the Court does not find this allegation relevant to the Safeway Defendants' prudence between the time period of 2011 to July 2016.  Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983).

United States District Court
Northern District of California

1    of available alternatives, without the influence of [JP Morgan Retirement Planning Services] and

2    Chase, they would have selected target date funds with an established record of performance and

3    lower fees, such as the Vanguard target date funds," thus resulting in higher investment returns for

4    Plan participants.  Id. ¶ 38-39.

5        The Safeway Defendants' failure to offer the investment option with the lowest expense

6    ratio is not enough, on its own, to plausibly state a claim for breach of the duty of prudence.  As

7    the Seventh Circuit has repeatedly explained, "[t]he fact that it is possible that some other funds

8    might have had even lower ratios is beside the point; nothing in ERISA requires every fiduciary to

9    scour the market to find and offer the cheapest possible fund (which might, of course, be plagued

10   by other problems)."  Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009); Loomis v.

11   Exelon Corp., 658 F.3d 667, 670 (7th Cir. 2011) (quoting Hecker, 556 F.3d at 586).  The Ninth

12   Circuit has agreed with this approach, noting that "[t]here are simply too many relevant

13   considerations for a fiduciary, for that type of bright-line approach to prudence to be tenable."

14   Tibble v. Edison Int'l, 729 F.3d 1110, 1135 (9th Cir. 2013), vacated on other grounds, 135 S. Ct.

15   1823 (2015).  Courts in this district have similarly cautioned that "[i]t is inappropriate to compare

16   distinct investment vehicles solely by cost, since their essential features differ so significantly."

17   See, e.g., White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 WL 4502808, at *12 (N.D. Cal.

18   Aug. 29, 2016).  Therefore, the Court cannot reasonably infer from the fee differential on its own

19   that the Safeway Defendants acted imprudently in selecting the JP Morgan target date funds.

20       However, Lorenz alleges more than that, and the remaining allegations in the complaint

21   create a plausible inference that the Safeway Defendants' decision-making process was flawed.

22   See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 601, n.7 (8th Cir. 2009) (noting that, although

23   "a bare allegation that cheaper alternative investments exist in the marketplace" is not sufficient on

24   its own to state a claim for a breach of fiduciary duty under ERISA, a court ruling on a motion to

25   dismiss must rest its conclusions "on the totality of the specific allegations in [the] case").  For

26   example, Lorenz alleges that, at the time the Safeway Defendants selected the JP Morgan target

27   date funds, they "had no meaningful record of performance so as to indicate that higher

28   performance would offset this difference in fees."  ECF No. 31 ¶ 37.  He further alleges that the

United States District Court
Northern District of California

14

1    Vanguard target date funds, in addition to charging lower management fees, "substantially

2    outperformed the comparable JPM Smartretire Passiveblend Funds" between 2010 and 2015.  Id. ¶

3    23.  This allegation does not, as the Safeway Defendants contend, invite the Court to rely on "the

4    impermissible benefit of hindsight."  ECF No. 51 at 5.  While it is true that "we judge a fiduciary's

5    actions based upon information available to the fiduciary at the time of each investment decision

6    and not from the vantage point of hindsight," St. Vincent, 712 F.3d at 716 (internal citations and

7    quotation marks omitted), a fiduciary also "has a continuing duty of some kind to monitor

8    investments and remove imprudent ones" that "exists separate and apart from the trustee's duty to

9    exercise prudence in selecting investments at the outset."  Tibble, 135 S. Ct. at 1828-29.  Lorenz

10   alleges that, despite its underperformance between 2010 and 2015, the Safeway Defendants acted

11   imprudently by retaining this fund until July 2016.  ECF No. 31 ¶¶ 18, 23.  Lorenz also alleges a

12   potential reason why the Safeway Defendants might have selected and retained this relatively new,

13   expensive, underperforming investment option: At the time the Safeway Defendants selected the

14   JP Morgan target date funds, JP Morgan Retirement Plan Services was recordkeeper for the Plan

15   and JP Morgan Chase Bank was trustee of the Plan.  SAC, Id. ¶ 19.  While it is true that bundling

16   services is a common industry practice that is not "automatically improper," courts have found

17   that such a practice may support a claim for breach of fiduciary duty where, as here, there are

18   additional reasons to suspect that the fiduciaries failed to reasonably investigate alternatives.  See

19   Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir. 2014).  When viewed collectively, the Court can

20   reasonably infer from these allegations that the Safeway Defendants engaged in a flawed decision-

21   making process by selecting and retaining the JP Morgan target date funds.  See Braden, 588 F.3d

22   at 596-98 (holding that the plaintiff stated a claim for breach of fiduciary duty where he alleged

23   that the Plan offered funds that charged higher fees than available alternatives, that

24   underperformed during the relevant time period, and that were included in the Plan because they

25   would provide the Plan's trustee with revenue sharing payments).

26           The Safeway Defendants respond that it is inappropriate to compare the JP Morgan target

27   date funds to the Vanguard target date funds because the former "consisted of an underlying mix

28   of actively managed and passively managed funds," whereas the latter "are exclusively index

15

funds." ECF No. 38 at 20.  Although the Safeway Defendants "could have chosen funds with higher fees for various reasons," "Rule 8 does not require a plaintiff to plead facts tending to rebut all possible lawful explanations for a defendant's conduct." <u>Braden</u>, 588 F.3d at 596 (holding that the district court erred by requiring that plaintiff "to rule out potential lawful explanations for [the fiduciaries'] conduct").  Such a rule "would invert the principle that the complaint is construed most favorably to the nonmoving party, and would impose the sort of probability requirement at the pleading stage which *Iqbal* and *Twombly* explicitly reject." <u>Id</u>. (internal citations and quotation marks omitted).  Although the Safeway Defendants may ultimately persuade the Court that they had legitimate reasons to select the JP Morgan target date funds, and thus did not act imprudently, Lorenz has satisfied his burden at this stage of the litigation by alleging facts from which the Court can reasonably infer that their decision-making process was flawed.

The Safeway Defendants also argue that the challenged expense ratios are within a range that other courts have found to be "reasonable as a matter of law." ECF No. 38 at 8, 19.  This argument suffers from several infirmities.

First, this approach would effectively carve out a presumption of prudence for expense ratios that fell within a certain range.  But the Supreme Court has rejected presumptions of prudence in the ERISA pleading context, advocating instead for "careful, context-sensitive scrutiny of a complaint's allegations" as a means to "divide the plausible sheep from the meritless goats." <u>Fifth Third Bancorp v. Dudenhoeffer</u>, 134 S. Ct. 2459, 2470 (2014).  The Ninth Circuit has similarly rejected a "bright-line approach to prudence" that hinges exclusively on cost, noting that "[t]here are simply too many relevant considerations for a fiduciary" for that approach to be tenable.  <u>See</u> <u>Tibble I</u>, 729 F.3d at 1135.  Even the Safeway Defendants argue elsewhere in their briefing that cost should not be dispositive of the prudence inquiry.  But they cannot have their cake and eat it, too.  Just as the plaintiff cannot plausibly allege a breach of fiduciary duty by simply pointing to the cost of the challenged investment in isolation, the defendants cannot defeat a claim for breach of fiduciary duty by doing the same thing.  In other words, the prudence inquiry is "fact intensive." <u>Tussey</u>, 746 F.3d at 336.  And, because it involves the application of a reasonableness standard, "[r]arely will such a determination be appropriate on a motion for

16

1    summary judgment," let alone a motion to dismiss.  Bd. of Trustees of S. California IBEW-NECA

2    Defined Contribution Plan v. Bank of N.Y. Mellon Corp., No. 09 CIV. 6273 RMB, 2011 WL

3    6130831, at *3 (S.D.N.Y. Dec. 9, 2011).  The Court therefore refuses to adopt an approach that

4    would immunize an investment from scrutiny simply because its expense ratio fell within a certain

5    range.

6           The Ninth Circuit's decision in Tibble I is consistent with this fact intensive approach to

7    the prudence inquiry.  There, the Ninth Circuit affirmed the district court's *summary judgment*

8    order, not a dismissal under Rule 12(b)(6).   Tibble v. Edison Int'l ("Tibble I"), 729 F.3d 1110,

9    1135 (9th Cir. 2013), vacated on other grounds, 135 S. Ct. 1823 (2015).  In deciding to grant the

10   defendant's motion for summary judgment, the district court below had relied on a wealth of

11   evidence to assess whether the inclusion of the challenged fund was prudent, including expert

12   testimony regarding whether the alternative investment option was an appropriate comparator.

13   See Tibble v. Edison Int'l, 639 F. Supp. 2d 1074, 1115 (C.D. Cal. 2009), aff'd, 711 F.3d 1061 (9th

14   Cir. 2013), and aff'd, 729 F.3d 1110 (9th Cir. 2013), and aff'd, 820 F.3d 1041 (9th Cir. 2016), and

15   vacated and remanded on other grounds, 843 F.3d 1187 (9th Cir. 2016).  The district court

16   ultimately concluded that "Plaintiffs [had] not identified any evidence" to suggest that "the retail

17   mutual funds that were actually chosen for inclusion in the Plan underperformed as compared to

18   other retail mutual funds that were available on the market."  Id. at 1116.  On appeal, the Ninth

19   Circuit referenced the lower court's post-trial findings of fact, and then went on to note, "[n]or is

20   the particular expense ratio range [of .03 to two percent] out of the ordinary enough to make the

21   funds imprudent."  Tibble I, 729 F.3d 1110, 1135.  This sentence, when viewed in its context and

22   in light of the procedural posture of the case, does not suggest that an investment is necessarily

23   prudent as a matter of law just because its expense ratio falls within a particular range.  Rather, the

24   Ninth Circuit was simply noting, after relying primarily on the district court's extensive post-trial

25   findings of fact, that the challenged expense ratios were not so excessive on their face that they

26   could create a triable issue regarding breach of fiduciary duty absent any other evidence that

27   would otherwise suggest imprudence.

28          Unlike the district court in Tibble I, this Court is not being asked to decide whether the

United States District Court
Northern District of California

17

evidence sufficiently backs up Lorenz's claims at this early stage in the litigation. Rather, it must accept Lorenz's allegations as true and construe any inferences reasonably flowing from those allegations in the light most favorable to him. As explained above, Lorenz's complaint, when read as a whole, plausibly alleges that the Safeway Defendants acted imprudently by offering the JP Morgan target date funds. Tibble I is therefore distinguishable.

The out-of-circuit cases that the Safeway Defendants rely on are also distinguishable because they involved challenges to the overall range of investment options offered in the portfolio as a whole, rather than a challenge to the fiduciary's decision to include a particular investment option. For example, the plaintiffs in Renfro challenged the "plan's mix and range of investment options," not "the prudence of the inclusion of any particular investment option." Renfro v. Unisys Corp., 671 F.3d 314, 325–28 (3d Cir. 2011) (dismissing the plaintiffs' claim because the plan offered "a reasonable range of investment options with a variety of risk profiles and fee rates," including an expense ratio range between .1 percent to 1.21 percent). Given the nature of the plaintiffs' claim, the Renfro court framed its holding in the following way: "[T]he range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees—are highly relevant and readily ascertainable facts against which the plausibility of *claims challenging the overall composition of a plan's mix and range of investment options* should be measured." Id. at 327 (emphasis added). The plaintiffs in Hecker similarly challenged "the fee distribution," alleging that the fiduciaries "offered *only* investment options with excessively high fees." Hecker v. Deere & Co., 556 F.3d 575, 584–85 (7th Cir. 2009) (emphasis added) (dismissing plaintiffs' claim because "the undisputed facts leave no room for doubt that the Deere Plans offered a sufficient mix of investments for their participants," including a "wide range of expense ratios" between .07 percent and just over one percent). Later, in Loomis, the Seventh Circuit characterized its holding in Hecker in the following way: "We held that as a matter of law that was an acceptable array of investment options." Loomis v. Exelon Corp., 658 F.3d 667, 670 (7th Cir. 2011). In other words, those courts held that the *range* of expense ratios offered was reasonable, not that a fiduciary's decision to include an investment option that has an expense ratio within that range is always reasonable as

a matter of law.

Because Lorenz does not challenge the prudence of the overall mix of investment options available in the Plan, but rather the prudence of the decision to include the JP Morgan target date funds in particular, the overall expense ratio range is less relevant in this case.  "Under ERISA, the prudence of investments or classes of investments offered by a plan must be judged individually." Langbecker v. Elec. Data Sys. Corp., 476 F.3d 299, 325 (5th Cir. 2007) (citing In re Unisys Sav. Plan Litig., 74 F.3d 420, 438–41 (3d Cir. 1996)).  In other words, "a fiduciary must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants."  DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 423 (4th Cir. 2007) (emphasis in original).  While it is true that, consistent with "modern portfolio theory," fiduciaries must also give appropriate consideration to "the role [an] investment or investment course of action plays in that portion of the plan's investment portfolio," courts have cautioned that, "[s]tanding alone, [modern portfolio theory] cannot provide a defense to the claimed breach of the 'prudent [person]' duties . . . " Id. (quoting 29 C.F.R. § 2550-404a-1).  Therefore, the Safeway Defendants cannot point to the prudence of the portfolio as a whole to evade their duty of prudence with respect to the JP Morgan target date funds in particular.

Moreover, to the extent Hecker and its progeny are relevant, they are nonetheless distinguishable on another ground:  Safeway's Plan offered a much narrower range of investment options and higher minimum expense ratios.  According to the annual participant fee disclosure notices, the Plan offered a total of eighteen to twenty-two investment options during the relevant time period, with expense ratios that ranged from .15 percent to 1.21 percent.  ECF Nos. 31 ¶¶ 21-22; ECF Nos. 39-11, 39-12, 39-13, 39-14.  This limited menu of options pales in comparison to the over 2,500 mutual funds offered by the plan in Hecker and the seventy-three options offered by the plan in Renfro.  Hecker, 556 F.3d at 578; Renfro, 671 F.3d at 318.  With respect to the number of investment options offered, this case is more analogous to Braden, where the plan offered just thirteen investment options.  Braden, 588 F.3d at 589.  There, the court concluded that "[t]he far narrower range of investment options available in this case makes more plausible the claim that this Plan was imprudently managed."  Id. at 596, n. 6.  The lowest expense ratio offered

19

1   during the relevant time period, .15 percent, is also higher than the lowest expense ratios offered

2   by the plans at issue in the Hecker line of cases.  Hecker, 556 F.3d at 581 (minimum expense ratio

3   of .07 percent); Loomis, 658 F.3d at 669 (minimum expense ratio of .03 percent); Renfro, 671

4   F.3d at 319 (minimum expense ratio of .1 percent).

5          The Hecker line of cases is distinguishable for yet another reason.  See Tussey, 746 F.3d at

6   336 (noting that the courts in Hecker, Loomis, and Renfro "carefully limited their decisions to the

7   facts presented").  The Eighth Circuit has distinguished Hecker and its progeny where the

8   complaint includes "allegations of wrongdoing with respect to fees."  Id.  ("The facts of this case,

9   unlike the cited cases, involve significant allegations of wrongdoing, including allegations that

10  [the fiduciaries] used revenue sharing to benefit [the fiduciaries] and [the recordkeeper] at the

11  Plan's expense.").  Like the plaintiffs in Braden and Tussey, Lorenz alleges that the fiduciaries

12  engaged in wrongdoing by agreeing to a revenue sharing arrangement that resulted in

13  unreasonable compensation to the Plan's record-keeper.  ECF No. 31 ¶ 4.  He also alleges that the

14  fiduciaries erred by allowing the Plan's trustee to improperly "influence" the investment options

15  offered by the Plan.  Id. ¶ 38.  These allegations further support Lorenz's claim that the fiduciaries

16  acted imprudently.

17         Finally, lacking support from the federal circuit courts, the Safeway Defendants point to a

18  decision from a court in this district, White v. Chevron Corp., No. 16-CV-0793-PJH, 2016 WL

19  4502808, at *1 (N.D. Cal. Aug. 29, 2016).  The analogy to that case fails for the same reasons.  As

20  an initial matter, it is unclear whether that case dealt with a challenge to the overall investment

21  lineup, the inclusion of particular funds, or some combination of the two.  Id. at *8, *12 ("This

22  cause of action challenges the defendants' decisions with regard to the selection and maintenance

23  of the Plan's mix and range of investment options. . . . [w]hile plaintiffs appear to be challenging

24  the entire lineup of funds, the challenge is primarily based on speculation that the Plan fiduciaries

25  "could have" provided lower-cost versions of the funds, . . .").  In any event, the White court relied

26  on Hecker and its progeny for the proposition that "[t]he breadth of investments and range of fees

27  the Plan offered participants fits well within the spectrum that other courts have held to be

28

United States District Court
Northern District of California

20

reasonable as a matter of law." Id. at * 11.[9]  The court concluded that "the Plan fiduciaries provided a diverse mix of investment options and expense ratios for participants."  Id.  As explained above, the breadth and range of investment options is less relevant here because, unlike the plaintiff in White, Lorenz does not challenge the overall investment lineup.  Moreover, to the extent the overall range is relevant to Lorenz's claim regarding the inclusion of the JP Morgan target date funds, the plan at issue in White offered thirty-one investment options, almost one-third more than the maximum number of options offered by Safeway's Plan, and the lowest expense ratio offered by the plan in White was just .05 percent, compared to the .15 percent minimum expense ratio offered here.  Id. at *2, *11.  White is also distinguishable because there were no allegations of wrongdoing.  Id.  For all of these reasons, the White court concluded that the claims at issue there were "more akin to the claims that failed in Loomis, Renfro, and Hecker."  Id. at *12.

In sum, this case is more analogous to the Braden line of cases than the Hecker line.  The Safeway Defendants argue that, when viewed in isolation, each of Lorenz's allegations do not plausibly suggest a flawed decision-making process.  However, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  Braden, 588 F.3d at 594 (citing Vila v. Inter–Am. Inv. Corp., 570 F.3d 274, 285 (D.C. Cir. 2009)).  When read in this way, and when construed in the light most favorable to him, Lorenz's allegations plausibly suggest that the Safeway Defendants acted imprudently in selecting and retaining the JP Morgan target date funds.

## 2.      Revenue Sharing Arrangement

Second, Lorenz alleges that the Safeway Defendants breached their duty of prudence by entering into a revenue sharing arrangement with the Plan's record-keepers.  SAC, ECF No. 31 ¶¶ 25-34.

Revenue sharing arrangements are not *per se* prohibited under ERISA.  See White, 2016

---

[9] Notably, the White court granted the plaintiff leave to amend the complaint, suggesting that the challenged expense ratios were not actually *per se* reasonable as a matter of law.  Id. at *19.  If they were, any amendment would have been futile.

United States District Court
Northern District of California

United States District Court
Northern District of California

WL 4502808 at *14 (rejecting "plaintiffs' conclusory assertion that fees under a revenue-sharing arrangement are necessarily excessive and unreasonable" as "without support"); Rosen v. Prudential Ret. Ins. & Annuity Co., No. 3:15-CV-1839 (VAB), 2016 WL 7494320, at *10 (D. Conn. Dec. 30, 2016) ("Plaintiffs' allegations that Prudential engaged in revenue sharing, without more, do not state a claim for a violation of ERISA.").[10]  However, the Employee Benefits Security Administration of the United States Department of Labor has opined that, to comply with their fiduciary duties under ERISA, "the responsible plan fiduciaries must assure that the compensation the plan pays directly or indirectly to [the service provider] for services is reasonable, taking into account the services provided to the plan as well as all fees or compensation received by [the service provider] in connection with the investment of plan assets, including any revenue sharing."  Employee Benefits Security Administration of the U.S. Department of Labor, Advisory Opinion 2013-03A (July 3, 2013).

Lorenz alleges that the revenue sharing arrangement at issue here "resulted in compensation to [JP Morgan Retirement Planning Services]/Great-West far in excess of reasonable compensation for such services."  SAC, ECF No. 31 ¶¶ 25-34.  He alleges that this compensation was unreasonable because the amount invested in these funds—and thus the record-keepers' revenue-sharing compensation—more than doubled between 2011 and 2014, whereas the number of participants in the Plan steadily declined.  Id.  "In other words, [JP Morgan Retirement Planning Services]/Great-West received greater and greater revenue for providing the same services . . . to a smaller number of participants."  Id.  He further alleges that "[t]he Safeway Defendants could have obtained record-keeping services at a much lower rate, had they: (1) negotiated a per-participant payment for record keeping rather than an asset-based charge . . . ; or (2) negotiated a lower asset-based charge when it became clear that the amounts invested in the JPM Smartretire Passiveblend Funds were growing so quickly as to generate a windfall for [JP Morgan Retirement Planning Services]/Great-West."  Id.

---

[10] In fact, courts have noted that revenue sharing is a "common and acceptable investment industry practice[] that frequently inure[s] to the benefit of ERISA plans."  Tussey, 746 F.3d at 336 (internal quotation marks omitted).

1    The Safeway Defendants respond that they took the very course of action that Lorenz says

2    they should have taken—that is, they compensated Great-West through an annual per-participant

3    fee.  ECF No. 38 at 20-21.  They contend that "the revenue sharing arrangement between the

4    recordkeeper and the Plan was simply the mechanism by which that per-participant fee was

5    collected."  Id.  They further argue that, "[i]n the event payments through the revenue sharing

6    arrangement exceeded $65 per participant at the end of the Plan Year, JPM would accumulate the

7    amounts under a 'Plan Expense Arrangement,'" and those funds "could only be used to pay

8    expenses that otherwise could have been paid from Plan assets and charged directly to

9    participants' accounts."  Id. at 13-14.

10    Although the Court construes all allegations in the complaint as true when ruling on a

11    motion to dismiss, it is "not required to accept as true conclusory allegations which are

12    contradicted by documents referred to in the complaint."  Warren v. Fox Family Worldwide, Inc.,

13    328 F.3d 1136, 1139 (9th Cir. 2003) (quoting Steckman v. Hart Brewing, Inc., 143 F.3d 1293,

14    1295-96 (9th Cir. 1998)).  Therefore, the Court also considers the extent, if any, to which the

15    judicially-noticed documents contradict Lorenz's allegations or otherwise render them

16    implausible.

17    Some aspects of the master services agreement support the Defendants' compensation

18    theory.  In that document, Safeway agreed to compensate JP Morgan Retirement Planning

19    Services, and later Great-West, for their record-keeping services through an annual "Contingent

20    Per Participant Fee."  ECF No. 37-2 at 22.  Under this arrangement, the record-keeper would

21    initially be "compensated from . . . the service fees or other compensation paid to [the record-

22    keeper] with respect to the Plan's investment options."  Id. That is, the record-keeper would

23    receive a percentage of the fees charged for each investment as a credit toward record-keeping

24    services.  Id. at 30.  This is what Lorenz refers to as the revenue-sharing payments.  However, the

25    agreement goes on to provide that these payments were simply used to offset the annual per-

26    participant fee: If the service fees that the record-keeper received for a particular quarter fell below

27    one-quarter of the annual per-participant fee, Safeway was required to "make a lump sum payment

28    to [the record-keeper] … in an amount equal to the difference between the foregoing amount and

United States District Court
Northern District of California

the amount of the actual annual service fees received by [the record-keeper]." Id. at 22.

Conversely, "[i]n the event the annual service fees received by [the record-keeper] exceed $65.00

per Participant at the end of the Plan Year, [the record-keeper] shall accumulate accruals under the

Plan Expense Arrangement ("PEA") in accordance with the terms and conditions of the PEA

Addendum to the Agreement." ECF No. 37-4 at 2–3; see also ECF No. 37-2 at 42 ("Accruals will

be calculated and attributed to the PEA at the end of each calendar quarter for all service fees

received by [the record-keeper] related to . . . investments in the Plan in excess of the applicable

Contingent Per Participant Fee . . ."). The excess funds in the PEA account could only be used at

the direction of the Safeway Defendants to reasonably compensate third-party service providers, in

accordance with ERISA. ECF No. 37-2 at 38, 39–40. Notably, the Safeway Defendants expressly

chose the "Contingent Per Participant Fee" option in lieu of a "No Recordkeeping Fee" option,

under which the record-keeper would have been compensated "solely from . . . the service fees or

other compensation paid or credited to [the record-keeper] with respect to the Plan's investment

options"—that is, a true revenue sharing compensation arrangement. Id. at 22–23. These

provisions suggest that Great-West did not, as Lorenz contends, receive increasing compensation

during the relevant time period to provide the same services because its compensation remained

capped at the annual per-participant fee. And the Defendants argue that, absent any allegations

that the annual per-participant fee is itself unreasonable, Lorenz has failed to plausibly allege that

Great-West received excessive compensation.

Lorenz contends that the master services agreement is ambiguous as to whether Great-

West received compensation in excess of the per-participant fee for two reasons. ECF No. 50 at

14-15. First, Lorenz points to paragraph 5(d) of the agreement, which states the following:

> As part of its compensation, Plan Administrator acknowledges that in addition to
> those fees charged directly by JPMorgan RPS for its services, JPMorgan RPS may
> receive fees and ancillary benefits from affiliates and outside sources in connection
> with the services it performs on behalf of the Plan and its Participants. Such fees
> and benefits may include, but are not limited to, servicing fees relating to
> investment funds utilized by the Plan. Where applicable, such fund-related service
> fees shall be described in the fee provisions of the Schedule. *JPMorgan RPS shall
> retain such fees for itself as payment for administrative and shareholder services
> specifically related to such investment funds.* Plan Administrator acknowledges
> that such fees may change without notice upon unilateral action taken by the
> investment fund. JPMorgan RPS shall provide, within 45 days after the end of the

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

calendar quarter, a reporting listing the rate and total dollar amount received of such fees.

ECF No. 37-2 at 6 (emphasis added); ECF No. 50 at 14-16.[11]  Lorenz argues that the italicized language creates "an ambiguity that requires discovery to resolve."  ECF No. 50 at15.  The Court disagrees.  Although this paragraph acknowledges that the record-keeper will receive some compensation in the form of revenue-sharing payments associated with particular investments, it in no way contradicts the capped, per-participant fee that appears later in the "Recordkeeping Fee" section of the agreement.  ECF No. 37-2 at 22.  Nor does this paragraph otherwise suggest that Great-West received compensation in excess of the per-participant fee.

Second, Lorenz argues that it is possible that the excess revenue sharing fees were not devoted solely to legitimate plan expenses because the PEA provides that, "[t]o the extent JPMorgan RPS is due payment by Plan Sponsor for services for any given calendar quarter and there exists a balance in the PEA account, such balance shall be first used to satisfy any amount owed JPMorgan RPS."  ECF No. 37-2 at 42.  Again, the Court disagrees.  This provision did not alter the amount of Great-West's compensation under the agreement, but rather just gave it priority to be paid before other service providers.  And this kind of compensation to a third-party service provider is a legitimate plan expense under ERISA, which can be paid using plan assets, as long as it is reasonable.  See 29 U.S.C. § 1106(a) (generally prohibiting a plan fiduciary from entering into a transaction that would transfer any plan assets to a party in interest); 29 U.S.C. § 1108(b)(2) (exempting such a transaction if the plan fiduciary contracts with a party in interest for "services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor").  Again, this provision does not suggest that the compensation paid to Great-West was unreasonable, and therefore does not advance Lorenz's argument.

---

[11] The Safeway Defendants argue that paragraph 5(d) did not apply to the JP Morgan target date funds because those funds were not offered when the agreement was executed in 2009, and therefore were not listed in the "Fund Fees" provision of the agreement that paragraph 5(d) refers to (the "fee provisions of the Schedule").  ECF No. 51 at 9-10.  However, when the Plan did begin to offer the JP Morgan target date funds in 2011, those funds were added to the "Fund Fees" provision via an amendment, and therefore became subject to paragraph 5(d).  ECF No. 37-4 (July 18, 2011 amendment to the master services agreement, which added the JP Morgan target date funds to the "Fund Fees" provision and states that "all other provisions of the Agreement shall continue in full force and effect").

United States District Court
Northern District of California

1     However, there is at least one provision in the master services agreement that suggests that

2     the record-keeper may have received compensation in excess of the per-participant fee, at least for

3     some portion of the relevant time period.  The PEA addendum provides that any accruals in the

4     PEA account "expire at 3:00 p.m. Central Time on the last business day, as determined by

5     JPMorgan RPS, of each subsequent Plan Year, or upon the termination of the Agreement or this

6     Addendum."  ECF No. 37-2 at 38.  The addendum does not explain what happens to the expired

7     funds.  See id.  But, because the record-keeper (i.e., JP Morgan Retirement Plan Services)

8     maintains the PEA account, it is plausible that any expired funds go to the record-keeper.  See id.

9     Such an arrangement would also explain why the Safeway Defendants and the record-keeper

10    entered into an amendment on November 1, 2013 to create an "ERISA spending account" to

11    replace the PEA.  ECF No. 37-5 at 2.  Pursuant to that amendment, if revenue-sharing fees exceed

12    the annual per-participant fee at the end of the year they will be attributed to the ERISA spending

13    account.  Id.  The ERISA spending account addendum materially differs from its PEA predecessor

14    because (1) the accruals do not expire and (2) it provides that "[i]n the event Plan Sponsor does

15    not exhaust the Account for a given calendar quarter, Plan Sponsor may allocate such eligible

16    unused amounts, held in the Account to Participant accounts."  Id. at 5.  Such an amendment

17    would have been unnecessary if there were never any unused accruals in the PEA in the years

18    prior.

19    The Court concludes that the judicially noticed documents do not refute Lorenz's

20    allegations or otherwise render them implausible. They do, however, create a factual dispute that

21    cannot be resolved on a motion to dismiss.  Lorenz has plausibly alleged that the record-keepers'

22    compensation hinged, at least in part, on revenue-sharing payments that increased during the

23    relevant time period, even though the record-keepers provided the same services to a decreasing

24    number of participants.  As explained above, these allegations, while not entirely supported by the

25    master services agreement, are not completely contradicted by it, either.  Accepting these

26    allegations as true, and drawing all reasonable inferences in Lorenz's favor for the purposes of this

27    motion, Lorenz has plausibly alleged that the record-keeper's compensation was unreasonable in

28    light of the services rendered and, therefore, that the Safeway Defendants breached their fiduciary

26

duty of prudence by entering into and maintaining such an agreement.  Although the Defendants may ultimately defeat Lorenz's theory of excessive compensation by showing that they were not actually compensated in excess of the per-participant fee, or that their compensation was otherwise reasonable, the Court cannot resolve this factual issue at this stage of the litigation.  This is especially true because Lorenz has not yet had the benefit of discovery, and therefore lacks inside information regarding the Safeway Defendants' decision-making process and the compensation actually provided to the record-keepers.

## CONCLUSION

The Court dismisses the prohibited transaction claim against the Safeway Defendants and Great-West with prejudice because it is untimely under the three-year statute of limitations. Because this is the only claim asserted against Great-West, the Court directs the Clerk to terminate Great-West as a defendant in this action.  The Court denies the motion to dismiss the claim against the Safeway Defendants for breach of fiduciary duty.

IT IS SO ORDERED.

Dated: March 13, 2017

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

27