R. Bradford Huss, No. 71303
Angel L. Garrett, No. 255682
Dylan D. Rudolph, No. 278707
TRUCKER ✦ HUSS
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California 94111
Telephone:     (415) 788-3111
Facsimile:      (415) 421-2017
E-mail:          bhuss@truckerhuss.com
                    agarrett@truckerhuss.com
                    drudolph@truckerhuss.com

Joseph C. Faucher, No. 137353
TRUCKER ✦ HUSS
A Professional Corporation
633 W. 5th Street, 26th Floor
Los Angeles, California 90071
Telephone:     (213) 537-1016
Facsimile:      (213) 537-1020
E-mail:          jfaucher@truckerhuss.com

Attorneys for Defendants
SAFEWAY INC., SAFEWAY BENEFIT
PLANS COMMITTEE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO)

| | |
|---|---|
| DENNIS M. LORENZ, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SAFEWAY INC., SAFEWAY BENEFIT PLANS COMMITTEE, and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 3:16-cv-04903 JST<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>**[Fed. R. Civ. Pro. 56]**<br><br>Date:     August 16, 2018<br>Time:     2:00 p.m.<br>Dept.:    Courtroom 9, 19th Floor<br>Judge:   Hon. Jon S. Tigar |

*Trucker ✦ Huss*
*A Professional Corporation*
*One Embarcadero Center, 12ᵗʰ Floor*
*San Francisco, California 94111*

-1-

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on August 16, 2018 at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Jon S. Tigar in the United States District Court, Northern District of California, San Francisco Division, located in Courtroom 9, 19th Floor, 450 Golden Gate Avenue, San Francisco, California 94102, Defendants Safeway Inc. and the Safeway Benefit Plans Committee will and hereby do move pursuant to Federal Rule of Civil Procedure 56 for summary judgment in the favor of the Safeway Defendants and against Plaintiff Dennis M. Lorenz on each of the Causes of Action set forth in Mr. Lorenz's Third Amended Complaint (Dkt. 66).

The motion will be based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed concurrently herewith, the Declarations of R. Bradford Huss and Michael Boylan and exhibit(s) thereto concurrently filed herewith, and the Declaration of Lisa Montalvo concurrently filed in the related *Maria Karla Terraza v. Safeway Inc., et al.* action (Case No. 3:16-cv-03994-JST), on all pleadings and papers filed in this matter, and on such further argument as may be presented at the hearing on this motion.

DATED: July 6, 2018                    TRUCKER ✦ HUSS, APC

By: /s/Joseph C. Faucher
    Joseph C. Faucher
    Attorneys for Defendants
    SAFEWAY INC. and SAFEWAY BENEFIT
    PLANS COMMITTEE

Trucker ✦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California 94111

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF RELEVANT FACTS AND ALLEGATIONS ..........................1

       A.     The Safeway Inc. 401(k) Plan. ...................................................................1

       B.     The Plan's Administration. ..........................................................................2

              1.     The Safeway Benefit Plans Committee. ...........................................2

              2.     The Plan's Service Providers. ...........................................................3

                     a)     Investment consultant, Aon Hewitt. .......................................3

                     b)     The Plan's Recordkeepers: JPMorgan RPS, Empower, and
                            Vanguard. .................................................................................3

              3.     The Plan's administrative costs. .......................................................4

       C.     The Committee's Process. ............................................................................7

       D.     The JPMorgan SmartRetirement Passiveblend series. ................................8

III.   PLAINTIFF'S CLAIMS ........................................................................................9

IV.    LEGAL STANDARD ...........................................................................................10

V.     ARGUMENT.........................................................................................................10

       A.     Plaintiff cannot establish the necessary element of causation for each of his claims.10

              1.     Plaintiff bears the burden of establishing a causal link between
                     claimed fiduciary breaches and alleged losses to the Plan. .......................10

              2.     Plaintiff has not established a causal link between any specific alleged
                     breach and loss to the Plan. ...........................................................12

       B.     Plaintiff has not met his burden of proving the Committee followed an imprudent
              process in selecting the JPMorgan SmartRetirement Passiveblend funds..............13

              1.     Plaintiff's purported expert David Witz does not provide support for
                     his claim that the JPM TDFs were improperly selected. ...............................13

              2.     The record supports the conclusion that the Committee's decision to
                     select the JPM TDFs was reasonable. ............................................14

       C.     Plaintiff presents no evidence that the Plan's administrative fees were
              unreasonable. ............................................................................................16

              1.     The Committee renegotiated the flat fee to the benefit of participants. ......17

              2.     Plaintiff presents no evidence that the Plan paid unreasonable
                     recordkeeping fees. ........................................................................17

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

-i-

        **3.**    **Plaintiff presents no evidence that more competitive bidding or renegotiation would have achieved lower administrative fees for the same services.** ...................................................................................**19**

    **D.**    **Plaintiff's damages theory contradicts the Committee's investment policy, and is premised on incomparable investment alternatives.** .....................................**20**

**VI.**    **CONCLUSION** ................................................................................................**21**

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

-ii-

# TABLE OF AUTHORITIES

**Cases**

*Bancorp v. Dudenhoeffer,*
  134 S.Ct. 2459 (2014)..................................................................................................11

*Brotherston v. Putnam Investments,*
  *LLC*, No. CV 15-13825-WGY, 2017 WL 2634361 (D. Mass. June 19, 2017) ......................12

*California Ironworkers Field Pension Trust v. Loomis Sayles & Co.,*
  259 F.3d 1036 (9th Cir. 2001) ......................................................................................13

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)....................................................................................................10

*CIGNA Corp. v. Amara,*
  563 U.S. 421 (2011)....................................................................................................20

*DiFelice v. U.S. Airways, Inc.,*
  497 F.3d 410 (4th Cir. 2007) ........................................................................................13

*Donovan v. Mazzola,*
  716 F.2d 1226 (9th Cir. 1983) ......................................................................................10

*Fifth Third Bancorp v. Dudenhoeffer,*
  134 S. Ct. 2459 (2014)................................................................................................10

*Friend v. Sanwa Bank California,*
  35 F.3d 466 (9th Cir. 1994) ..........................................................................................11

*In re Unisys Sav. Plan Litig.,*
  74 F.3d 420 (3d Cir. 1996) ..........................................................................................10

*Johnson v. Providence Health & Servs.,*
  No. C17-1779-JCC, 2018 WL 1427421 (W.D. Wash. Mar. 22, 2018) ..........................17, 19

*Kanawi v. Bechtel Corp.,*
  590 F. Supp. 2d 1213 (N.D. Cal. 2008) ........................................................................13

*Kuper v. Iovenko,*
  66 F.3d 1447 (6th Cir. 1995) ........................................................................................11

*Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.,*
  858 F.3d 1324 (10th Cir. 2017) ................................................................................11, 20

*Ronches v. Dickerson Employee Benefits, Inc.,*
  No. CV 90-4279-MMM-PJWX, 2009 WL 10669571 (C.D. Cal. Oct. 30, 2009) ....................11

*S. City Motors, Inc. v. Auto. Indus. Pension Tr. Fund,*
  No. 17-CV-04475-JST, 2018 WL 2387854 (N.D. Cal. May 25, 2018) ..............................10

*Sacerdote v. New York Univ.,*
  No. 16-CV-6284-KBF, 2017 WL 3701482 (S.D. N.Y. Aug. 25, 2017) ..............................19

-iii-

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

*Schaffer ex rel. Schaffer v. Weast*,
    546 U.S. 49 (2005)..............................................................................................20

*Silverman v. Mut. Ben. Life Ins. Co.*,
    138 F.3d 98 (2d Cir. 1998) ...............................................................................11

*Tibble v. Edison Int'l*,
    639 F. Supp. 2d 1074 (C.D. Cal. 2009) ...........................................................13

*White v. Chevron Corp.*,
    No. 16-CV-0793-PJH, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ..........17, 19

*Willett v. Blue Cross & Blue Shield of Ala.*,
    953 F.2d 1335 (11th Cir. 1992) .......................................................................11

*Wright v. Oregon Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) .........................................................................11

*Young v. GM Inv. Mgmt. Corp.*,
    325 Fed. Appx. 31, 33 (2d Cir. 2009)..............................................................19

**Statutes**

29 U.S.C. § 1104(a)(1)(B) ......................................................................................9

29 U.S.C. § 1109(a) ..........................................................................................10, 11

**Other Authorities**

2 McCormick on Evid. § 337 (7th ed. 2013) ........................................................20

**Rules**

Fed. R. Civ. P. 56(c) ...............................................................................................9

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Plaintiff Dennis Lorenz ("Plaintiff") cannot carry his burden to prove each essential element of his claims. He does not identify a specific decision or indecision on the part of the Committee with respect to the selection of the JPMorgan Smartretirement PassiveBlend target date funds ("JPMorgan TDFs") that amounted to a breach of fiduciary duty, and he does not link any alleged breach to a loss to the Plan. Instead, Plaintiff's purported expert, David Witz, merely lists other investments that he claims offered lower investment fees, "some of which" performed better than the JPMorgan TDFs. He does not prove, however, that these alternatives were actually available to the Plan as funds similar to the JPMorgan TDFs or that the Plan should have selected these supposed alternatives in their place. And, he ignores the revenue sharing component attached to the JPMorgan TDFs, and does not account for this component when comparing the funds to the supposed alternatives that he characterizes as less expensive, including to a different share class of JPMorgan TDFs that did not offer revenue sharing.

Moreover, Plaintiff claims the revenue sharing paid by the JPMorgan TDFs was excessive, and portrays this revenue sharing arrangement as seemingly limitless. But, he does not address that the Plan paid its recordkeepers – JPMorgan Retirement Plan Services ("JPM RPS") and Great-West (dba Empower) – a flat, per-participant fee that was renegotiated lower throughout the relevant time period to lessen costs for Plan participants. He presents no alternative recordkeeper that could have offered the same services provided by the Plan's recordkeepers for a lower fee. And, he has not provided any evidence that the administrative costs paid by the Plan, or the revenue sharing collected from the JPMorgan TDFs was unreasonable.

Plaintiff cannot prove essential elements of his claims. The Court should grant summary judgment in favor of the Safeway Defendants.

## II.   STATEMENT OF RELEVANT FACTS AND ALLEGATIONS

### A.   The Safeway Inc. 401(k) Plan.

The Safeway Inc. 401(k) Plan (the "Plan") was a self-directed, defined contribution plan offered by Safeway Inc. ("Safeway") that provided participants with a tax-deferred retirement account using employee salary deferrals. (Declaration of R. Bradford Huss ["Huss Dec."], Ex. 20 (2016 Form

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California  94111

-1-

5500, Notes), p. 6.)  During the relevant time period – July 14, 2010 to July 14, 2016 – the Committee's investment philosophy was to "create an investment program to provide for the full range of risk tolerance commonly available in retirement savings plans."  (Huss Dec., Ex. 23 (2005 Investment Policy Statement ["IPS"]), p. 1; Ex. 24 (2012 IPS), p. 2)  Accordingly, the Plan offered an array of investment options along the risk spectrum, including:  a stable value fund, target date funds, an intermediate bond fund, actively managed large and small capitalization growth and value equity funds, a passively managed large capitalization equity index fund, an international equity fund, and, for a time, Safeway Company Stock.  (*Id.* Ex. 23 (2005 IPS), p. 2; Ex. 24 (2012 IPS), p. 27.)

On January 30, 2015, Albertsons LLC ("Albertsons") acquired Safeway Inc. (Huss Dec., Ex. 1 (Deposition of Robert Dimond ["Dimond Depo."], p. 17:5-8).)[1]  The Safeway Inc. 401(k) Plan was thereafter eventually merged with the existing Albertsons 401(k) plans.  (Huss Dec., Ex. 2 (Deposition of Andrew Scoggin ["Scoggin Depo."], p. 14:17-20).)  As of December 31, 2014, just prior to the Albertsons acquisition, the Plan had approximately $1.9 billion in assets, and 37,000 participants. (Huss Dec., Ex. 22 (2014 Form 5500), p. 2; (Notes), p. 19).)  Following the Plan's merger with the Albertsons plans, assets in the combined plan totaled approximately $5 billion, with nearly 94,000 participants.  (Huss Dec., Ex. 25, p. 1; Ex. 26, p. 4.)

**B.     The Plan's Administration.**

**1.     The Safeway Benefit Plans Committee.**

The Plan's investments were selected and monitored by the Benefits Plan Committee ("BPC" or "Committee").   The Committee included, among others, a financial professional who had previously served as Chief Financial Officer of Starbucks, a graduate of Stanford University and the U.C. Berkeley Haas School of Business, and a graduate of the University of Virginia School of Law who had served on the Committee since 1988.[2]  The members of the Committee understood their

---

[1] Effective January 30, 2015, Safeway merged with AB Acquisition LLC, Albertson's Holding, LLC, Albertson's LLC and Saturn Acquisition Merger Sub, Inc. and the Safeway common stock was eliminated as Plan investment option.  (Huss Dec., Ex. 22 (2014 Form 5500; Notes), p. 7.)

[2] Huss Dec., Ex. 3 (Deposition of Peter Bocian ["Bocian Depo."], pp. 21:25-22:11); Ex. 4 (Deposition of Bradley Fox ["Fox Depo."], p. 10:15-17); Ex. 5 (Deposition of Michael Boylan ["Boylan Depo."], pp. 22:19-23:2; 23:25-24:5).

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

fiduciary duties to the Plan and its participants.[3]

## 2.  The Plan's Service Providers.

### a)  Investment consultant, Aon Hewitt.[4]

Aon entered into a master services agreement with the Plan to perform investment consulting services for the Committee, effective September 23, 1994.  (Declaration of Michael Boylan ["Boylan Dec."], Ex. 8., p. 1.)  Throughout the relevant time period, Aon prepared detailed quarterly reports for the Committee that closely analyzed the performance and fees of the Plan's investments.[5]  These reports, and other materials that Aon provided to the Committee, informed Committee members about market conditions, performance of the Plan's options relative to their benchmarks, benchmarking of the expense ratios of the Plan investment options compared to peer groups of similar investments, and the amount of revenue sharing paid by the Plan's funds for use in paying administrative costs.[6]  Aon benchmarked the Plan's total costs compared to other similar plans in the market.  (*See, e.g.,* Huss Dec., Ex. 28.)  In 2011, the Committee put the investment advisory work out to bid, but based on an extensive request for proposal ("RFP") process and the quality of services Aon had provided for its fees, Aon was renewed as investment adviser to the Plan.  (Boylan Dec., Ex. 5.)

### b)  The Plan's Recordkeepers:  JPMorgan RPS, Empower, and Vanguard.

In 2008, the Plan retained Watson Wyatt (now part of Willis Towers Watson), to consult on the RFP process for selecting a recordkeeper for the Plan.  (Declaration of Lisa Montalvo ["Montalvo

---

[3] Huss Dec., Ex. 3 (Bocian Depo., p. 29:1-18); Ex. 6 (Deposition of Russell Jackson ["Jackson Depo."], p. 16:20-25); Ex. 7 (Deposition of Melissa Plaisance ["Plaisance Depo."], p. 12:20-25); Ex. 8 (Deposition of Dennis Dunne ["Dunne Depo."], p. 17:3-14).

[4] After the third quarter of 2010, Hewitt Associates LLC merged with Aon, and are referred to as "Hewitt Ennis Knupp" in the Safeway BPC meeting minutes and presentation materials thereafter. (Huss Dec., Ex. 27.)  These entities are collectively referred to as "Aon" in this brief.

[5] *See, e.g.,* Huss Dec., Ex. 28 (2012 Plan Cost Analysis) (Depo. Ex. 77); Ex. 29 (2015 Discussion Guide) (Depo Ex. 52); Ex. 30 (2016 Quarterly Investment Review) (Depo Ex. 122); Boylan Dec., Ex. 1 (2010 PRIME Report); Ex. 2 (2011 PRIME Report); Ex. 3 (2013 Quarterly Investment Review ("QIR"); Ex. 4 (2014 QIR).

[6] "Revenue sharing" is a common practice in the retirement plan industry, pursuant to which the investment management company that manages the investment fund pays a portion of the expense ratio that it receives to the plan's recordkeeper to defray costs that would otherwise have been charged directly to the plan.  (*See* Huss Dec., Ex. 31 (JPM MSA), p. 21.)

-3-

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California  94111

Dec."], ¶4.)[7]   At that time, the Plan's recordkeeper was Merrill Lynch. (*Id.*)   Several vendors submitted proposals including the incumbent Merrill Lynch and JPM RPS. (*Id.*)   Fidelity was also asked to submit a proposal but declined to do so.  (*Id.*)  After analyzing the information provided in the proposals, two finalists – JPM RPS and Merrill Lynch – were selected. (*Id.*)  Each presented to the Committee and site visits were conducted.  (*Id.*)  Both finalists met the Plan's criteria, including competitive and transparent fees.  (*Id.*)  JPM RPS proposed fees ($67 per participant per year) that were significantly less than those proposed by Merrill Lynch, the incumbent recordkeeper ($76 per participant per year).  (*Id.*)   The Committee ultimately decided to select JPM RPS because it demonstrated a strong desire to partner with Safeway, had outstanding employee communication capabilities, and lower overall fees.  (*Id.*)

JPM RPS became the Plan's recordkeeper from 2009 until Great-West (dba Empower) acquired it in the third quarter of 2014.  (*Id.*, ¶5.)  Empower remained the Plan's recordkeeper until the end of July 2016 when the Vanguard Group ("Vanguard") became the Plan's recordkeeper after the Albertsons acquisition.  (*Id.*)  JPM RPS, and later Empower, provided numerous services for the Plan for a flat, per-participant rate, including:

> [C]onversion and installation services, maintenance of Participant account balances, processing of transactions, Participant level tax withholding and reporting, provision of Participant statements, compliance services, preparation of Plan Sponsor and Plan Administrator reports, provision of enrollment kits and employee education meetings, application of Plan eligibility requirements, assistance with ERISA Section 404(c) compliance, and prototype plan document services . . . Participants access by telephone to a voice response system (available 24-hours a day) . . .

(Huss Dec., Ex. 31 (JPM MSA), p. 18.)  This type of service platform differed from that offered by Fidelity, which serviced the pre-acquisition Albertsons plans.  Fidelity charged a lower per participant fee (negotiated based on the larger size of the Albertsons plans), but charged additional fees for add-on services.  (*See, e.g.*, Huss Dec., Ex. 1 (Dimond Depo. pp. 21:24-22:5).)

### 3.   The Plan's administrative costs.

The Plan paid its administrative costs from two sources:  (1) revenue sharing funds collected

---

[7] The Declaration of Lisa Montalvo is filed concurrently with this filing in the related *Maria Karla Terraza v. Safeway Inc., et al.* case. (*See* USDC N.D. No. 3:16-cv-03994-JST,  Dkt. 144-1).

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California  94111

-4-

from the Plan's investments,[8] and (2) an annual $12 per participant line item fee charged to participants' accounts that was deposited into an "Accounts Payable" account. (Huss Dec., Ex. 31 (JPM MSA), p. 19, ¶5.) The Plan's recordkeeping costs were capped at a fixed per participant fee. (Montalvo Dec., ¶6; Huss Dec., Ex. 31 (JPM MSA), p. 21.) Originally $67 per participant annually, the Plan's recordkeeping fees were periodically renegotiated, and lowered to $65 in 2011 and then to $52 in April 2015. (Montalvo Dec., ¶6.)

Under the terms of the Plan's agreement with JPM RPS/Empower, any revenue sharing amount that exceeded the flat per-participant fee was placed in a "Plan Expense Arrangement" ("PEA").[9] (Montalvo Dec., ¶6; Huss Dec., Ex. 31 (JPM MSA) (13877).) The PEA was available to pay expenses that were otherwise payable by the Plan. (*Id.*) Although the JPM MSA stated that any amounts left in the PEA at the end of the Plan year would expire, no amounts in the PEA ever expired at the end of the Plan year for the time the PEA was in effect. (Montalvo Dec., ¶6.) JPM never received compensation in excess of the negotiated flat fee amount during the relevant time period. (*Id.*) If, however, the revenue sharing was ever insufficient to cover the administrative costs in a particular quarter, any shortfall was paid from the Accounts Payable account. (Huss Dec., Ex. 32 (38275).) Over the course of several years, a surplus accumulated in the Accounts Payable account. (Huss Dec., Ex. 13 (Deposition of Robert Larson ["Larson Depo."]), p. 28:21-25.) Eventually, this surplus reached $3 million and at that time the Committee decided to distribute the account proceeds to Plan participants. (*Id.*, pp. 31:9-11; 34:6-15.)

There is no *admissible* evidence in the record to support Plaintiff's claim that the recordkeeping fees paid by the Plan were unreasonable. Plaintiff's expert, David Witz, offers no opinion in this regard. (Huss Dec., Ex. 42.) Plaintiff has cross-designated expert witnesses Roger Levy and Martin Dirks, who were identified by Plaintiff Maria Terraza in the related *Maria Karla*

---

[8] Mr. Levy acknowledges, "there is nothing inherently inappropriate about revenue sharing, and the all-in fee which results from revenue sharing arrangements." (Huss Dec., Ex. 15, Expert Witness Report of Roger L. Levy, ¶ 91.)

[9] In 2013, the Committee replaced the PEA with an "ERISA Spending Account." (Montalvo Dec., ¶7.) The ESA served the same purpose as the PEA, except that any amounts that remained in the ESA at the end of the Plan year would be distributed to participants. (*Id.*)

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California 94111

*Terraza v. Safeway Inc.*, *et al.* case (No. 3:16-cv-03994-JST).   (*See* Huss Dec., Ex. 46.)   Plaintiff identified Messrs. Levy and Dirks as witnesses he may call at trial, and incorporated reports that Mr. Levy and Mr. Dirks authored in the *Terraza* action by reference.[10]   (*Id*.)   The only possible evidence Plaintiff relies on to support this claim, therefore, is based on the opinions Messrs. Levy and Dirks.

Roger Levy, compared the Plan's recordkeeping fees to those charged by the recordkeepers for the Albertsons plan and concluded that, because the Albertsons plans' fees were lower, the Safeway Plan's fees were unreasonable.   (Huss Dec., Ex. 15, (Levy Report), ¶89.)   Mr. Dirks engaged in a similar analysis.   (Huss Dec., Ex. 16.)   However, that bare comparison is unreliable and therefore inadmissible.   Levy ignores that the bidding process by Albertsons resulting in these fees took the amount of the plans' respective assets and participants into account:   the Albertsons LLC and NAI plans were bid together, with combined assets of $3.2 billion and 51,853 participants (*see* Huss Dec., Ex. 25, p. 1; Ex. 26, p. 4), whereas, at the time of the Albertsons acquisition, the Safeway Plan had just $1.7 billion in assets and 37,100 participants (*see* Huss Dec., Ex. 21 (2015 Form 5500), p. 2, (Notes), p. 5).[11]   Once the Albertsons affiliated plans were combined for the purpose of the 2016 RFP, the combined assets were nearly $5 billion, with about 95,000 participants.   (Huss Dec., Ex. 25, p. 1; Ex. 26, p. 4.)

By leveraging the size of the combined Plans and participants, the recordkeeping fees were ultimately lowered to $31 per participant when the Plan moved to Vanguard.   (Huss Dec., Ex. 25, p. 1.)   As Levy admits, per-participant recordkeeping fees for a larger plan are lower than those for a smaller plan, all other factors being equal.   (Huss Dec., Ex. 14 (Deposition of Roger Levy ["Levy Depo."], pp. 102:12-18; 115:15-20.)   Moreover, Levy admitted that he had "no evidence in front of him" that would allow him to evaluate the "level of services provided to that Albertsons pre-consolidated plan by the record keeper were the same as the level of services provided by Empower to the Safeway Plan." (*Id.*, p. 103:17-23.)

---

[10] The Expert Witness Reports of Mr. Levy and Mr. Dirks are attached to the Huss Dec. as Exs. 15 and 16, and referred to herein as the "Levy Report" and "Dirks Report," respectively.

[11] As Committee member Peggy Jones testified, "…Fidelity looked at it as a plan of 52,000 people. (Huss Dec., Ex. 11 (Jones Depo., p. 106:14-19).)

SAFEWAY DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; Case No: 3:16-cv-04903 JST
175908

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California 94111

Moreover, although he acknowledges that a proper analysis of recordkeeping expenses requires a comparison of the scope of services provided from plan to plan (*see* Huss Dec., Ex. 15 (Levy Report), ¶90); Ex. 14 (Levy Depo.), pp. 138:19-139:4),  Mr. Levy did not compare the services provided by the Plan's recordkeeper with the services provided by the Albertson's plan recordkeeper. (Huss Dec., Ex. 14 (Levy Depo.), p. 103:17-23.)  Conversely, the Safeway Defendants presented the opinion of recordkeeping expert Steven Gissiner, who concluded that, based on his "benchmarking analysis and review of the Safeway Plan, the Plan's total costs and administrative fees paid to JPM RPS and Great-West RPS were reasonable and well within the range of costs paid by comparable plans."  (Huss Dec., Ex. 17 (Report of Steven Gissiner ["Gissiner Report"]), ¶16.)

**C.     The Committee's Process.**

The Committee engaged in a deliberative process in managing the Plan and held regular quarterly meetings.[12]  Before each meeting, the Committee members received a written packet of information from Aon.[13]  These written materials included analyses of the performance and fees of the Plan's investments, legislative and regulatory updates and information pertaining to fiduciary responsibilities.[14]  Occasionally, at the Committee's request, Aon provided the Committee with additional analyses of various special topics.[15]  The Committee members thoroughly reviewed this information before each meeting, and actively discussed it in their meetings.[16]  The Committee regularly benchmarked the Plan's total costs against those of similar-sized plans.[17]  The Committee maintained a "watch list" of funds in order to make an informed decision as to whether to remove a

---

[12]  *See* Huss Dec., Ex. 6 (Jackson Depo., p. 17:14-16); Ex. 7 (Plaisance Depo.), p. 23:4-10; Ex. 5 (Boylan Depo., p. 87:22-25); Ex. 9 (Hardy Depo., p. 21:8-11).

[13]  *See* Huss Dec., Ex. 3 (Bocian Depo., pp. 30:15-25, 33:3-17); Ex. 6 (Jackson Depo., pp. 19:12-19); 56:13-24; Ex. 7 (Plaisance Depo., pp. 23:16-24:2); Ex. 8 (Dunne Depo., p. 33:13-18).

[14]  *See* Huss Dec., Ex. 3 (Bocian Depo., pp. 29:12-18, 33:3-7); Ex. 6 (Jackson Depo., p. 20:4-9); Ex. 7 (Plaisance Depo., pp. 23:16-24:1-20); Ex. 9 (Hardy Depo., p. 21:19-23).

[15]  *See* Huss Dec., Ex. 3 (Bocian Depo., p. 37:4-12); Ex. 7 (Plaisance Depo., p. 25:1-8).

[16]  *See* Huss Dec., Ex. 3 (Bocian Depo., pp. 30:22-25, 33:12-25, 34:20-35:2); Ex. 6 (Jackson Depo., pp. 19:16-19, 32:10-33:2); Ex. 7 (Plaisance Depo., p. 35:4-6); Ex. 8 (Dunne Depo., p. 33:16-23).

[17]  *See* Huss Dec., Ex. 3 (Bocian Depo., p. 33:21-25); Ex. 6 (Jackson Depo., p. 51:19-25); Ex. 7 (Plaisance Depo., p. 35:4-18).

SAFEWAY DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; Case No: 3:16-cv-04903 JST
175908

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California  94111

fund. [18]   Plaintiff Terraza's purported expert Roger Levy summed up the type of process that would

demonstrate that a 401(k) committee was exercising necessary independent judgment, stating,

> [T]hey would meet periodically.  Generally speaking, one would expect to see that happen on a quarterly basis.  And they would receive, in advance, the presentation that the advisor proposes to make at the next meeting.  And – and so, they – the investment committee members would be expected to thoroughly review the material that they're presented with.  And … do so in an inquisitive manner, and – and be prepared to raise questions if they don't understand some of the presentation that's being made.

(Huss Dec., Ex. 14 (Levy Depo.), p. 80:3-22.)  Mr. Levy should agree, then, that the Committee's

actions followed this this method, as the record shows the Committee's process was strikingly similar

to what Mr. Levy described.

Throughout the relevant time period, the performance of the Plan's funds was judged based on

a three- to five-year time horizon, with the goal that the Plan's funds would perform in the top 50% of

their peer groups.  (*See*, *e.g.*, Huss Dec., Ex. 7 (Plaisance Depo., pp. 23:25-24:25); Ex. 5 (Boylan

Depo., pp. 112:6-113:4); Ex. 9 (Hardy Depo., p. 41:7-24); Ex. 8 (Dunne Depo., pp. 118:25-119:9).)

Through this process, the Committee sometimes replaced funds to reduce costs to participants.  The

Wells Fargo fund[19] that replaced the Chesapeake Core Growth fund had an expense ratio that was 55

bps[20] lower.  (Huss Dec., Ex. 40, p. 8.)  The Committee also decided to move the Plan's PIMCO Bond

and RS Small Cap Value funds to separately managed accounts, resulting in net fee savings of

$600,000 to participants.  (Huss Dec., Ex. 33.) (*See also* Huss Dec., Ex. 12, pp. 105:13-24 (noting that

the Committee moved the PIMCO and RS Partners funds to separately managed accounts once "they

had met the minimum asset level to be able to get a separate account…").)

**D.**     **The JPMorgan SmartRetirement Passiveblend series.**

At the time the Committee selected the JPMorgan target date funds, Aon had recommended

---

[18]  *See* Huss Dec., Ex. 3 (Bocian Depo., p. 147:3-15); Ex. 6 (Jackson Depo., p. 64:4-14); Ex. 7 (Plaisance Depo., pp. 27:21-28:3); Ex. 10 (Deposition of Robert Edwards ["Edwards Depo."], p. 85:17-25).

[19]  The full name of this fund is the Wells Fargo Advantage Strategic Large Cap Growth fund.

[20]  The acronym "bps" stands for "basis points."  One basis point amounts to 1/100 of 1%, used to measure expense ratios of the Plan's investment funds and associated revenue sharing components.  *See* Investopedia, https://www.investopedia.com/terms/b/basispoint.asp (last visited July 6, 2018).

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California  94111

that the Committee consider additional JPMorgan funds.  (Huss Dec., Ex. 37.)  These proposed additional changes included replacing the SSgA S&P 500 Index fund with a JPMorgan Equity Index fund and replacing the Forward Emerald Growth fund with a JPMorgan Small Cap Growth fund.  (*Id.*)  Although Aon presented multiple options, the Committee only opted to replace the BlackRock target date funds with the JPMorgan TDFs, and the Chesepeake fund with the Wells Fargo fund based on performance and cost savings opportunities. (Huss Dec., Exs. 27, 37-39.)  The Committee carefully considered these two changes over the course of several months. (Huss Dec., Exs. 38-40.) Ultimately, the Committee rejected the addition of other JPMorgan funds, and chose the Wells Fargo and JPMorgan funds. (*Id.*, Ex. 38.) And not only were the JPMorgan TDFs  less expensive, they turned out to be better performing options as well.[21]  (*Id.*)

## III.   PLAINTIFF'S CLAIMS

Plaintiff Lorenz alleges that the Safeway Defendants breached their fiduciary duty of prudence by:  (1) selecting the JPMorgan target date funds that charged higher fees than comparable, readily-available funds, and which had no meaningful record; and (2) entering into and maintaining a revenue-sharing agreement with the Plan's recordkeepers (JP Morgan RPS and later Great-West) that resulted in excessive compensation to those entities.[22]

ERISA's duty of prudence "requires that a pension plan fiduciary act 'with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.'" (Dkt. 109, p. 5) (citing 29 U.S.C. § 1104(a)(1)(B)).  Under this prudent person standard, courts must determine "whether the individual trustees, *at the time they engaged in*

---

[21] Expert Roger Levy relies on the IPS's statement that the Plan's target date option should be a "passive" strategy, and that, because the JPMorgan target date funds the Plan offered had underlying active components, selection of these funds violated the IPS.  (Huss Dec., Ex. 15 (Levy Report), p. 3, ¶7(j).)  But the JPMorgan funds were selected before this 2012 IPS went into effect.  Moreover, Aon's Bryan Ward acknowledged that the "passive" language in the 2012 IPS referring to the Plan's target date option was simply a typo.  (Huss Dec., Ex. 12 (Ward Depo.), p. 126:17-20) ("the description here is an oversight in terms of changing this to be from when it was BlackRock to when it was JPMorgan.").

[22] Plaintiff's TAC also asserts a prohibited transaction claim, but this claim was dismissed by the Court in response to the Safeway Defendants' motion to dismiss.  (Dkt. 58.)

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California  94111

1  *the challenged transactions*, employed the appropriate methods to investigate the merits of the
2  investment and to structure the investment." *Id.* (emphasis added) (citing *Donovan v. Mazzola*, 716
3  F.2d 1226, 1232 (9th Cir. 1983)). This analysis "focus[es] on a fiduciary's conduct in arriving at an
4  investment decision, not on its results." *Id.* (citing *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d
5  Cir. 1996)). And, "[b]ecause the content of the duty of prudence turns on 'the circumstances . . .
6  prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific."
7  *Id.* (citing *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014)).

## IV.  LEGAL STANDARD

9  Summary judgment is granted in a moving party's favor when the evidence, viewed in the
10  light most favorable to the nonmoving party, shows that there is no genuine issue as to any material
11  fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).
12  Where, as here, "the party moving for summary judgment would not bear the burden of proof at trial,
13  that party 'must either produce evidence negating an essential element of the nonmoving party's claim
14  or defense or show that the nonmoving party does not have enough evidence of an essential element to
15  carry its ultimate burden of persuasion at trial.'" *S. City Motors, Inc. v. Auto. Indus. Pension Tr.*
16  *Fund*, No. 17-CV-04475-JST, 2018 WL 2387854, at *2 (N.D. Cal. May 25, 2018) (Tigar, J.) (citing
17  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)). "If the moving
18  party satisfies its initial burden of production, the nonmoving party must produce admissible evidence
19  to show that a genuine issue of material fact exists." *Id.* And, if "the nonmoving party fails to make
20  this showing, the moving party is entitled to summary judgment." *Id.* (citing *Celotex Corp. v.*
21  *Catrett*, 477 U.S. 317, 322-23 (1986)).

## V.  ARGUMENT

### A.  Plaintiff cannot establish the necessary element of causation for each of his claims.

#### 1.  Plaintiff bears the burden of establishing a causal link between claimed fiduciary breaches and alleged losses to the Plan.

26  ERISA requires a breaching fiduciary to "make good to such plan any losses to the plan
27  *resulting from* each such breach." 29 U.S.C. § 1109(a) (emphasis added). A plaintiff alleging
28  fiduciary breach bears the burden of proving this "*causal link* between the [alleged breach] and the

-10-

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California 94111

harm suffered by the plan." *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004) (emphasis in original and internal citation omitted).  *See also Friend v. Sanwa Bank California,* 35 F.3d 466, 469 (9th Cir. 1994) (granting summary judgment in the defendant's favor after finding the plaintiff had "not presented a genuine issue of material fact that this act caused the Plans' losses. ERISA holds a trustee liable for a breach of fiduciary duty only to the extent that losses to the plan result from the breach."); *Ronches v. Dickerson Employee Benefits, Inc.*, No. CV 90-4279-MMM-PJWX, 2009 WL 10669571, at *22 (C.D. Cal. Oct. 30, 2009), holding the "statutory phrase 'resulting from' indicates that there must be 'some causal link between the alleged breach of [fiduciary] duties and the loss plaintiff seeks to recover" and citing *Silverman v. Mut. Ben. Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998). *See also Pioneer Centres Holding Co. Employee Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (the "plain language of § 1109(a) establishes liability for losses 'resulting from' the breach," which "indicates that 'there must be a showing of some causal link between the alleged breach and the loss plaintiff seeks to recover.'").[23]

Plaintiff may not shift the burden to the Safeway Defendants to *dis*prove causation.  "The majority of federal circuits that have considered the issue agree.  These courts have refused to incorporate any burden shifting into ERISA breach of fiduciary duty claims because the language 'resulting from' in 29 U.S.C. § 1109(a) makes '[c]ausation of damages ... an element of the claim, and the plaintiff bears the burden of proving it.'"  *Pioneer*, 858 F.3d at 1336 (citing *Silverman,* 138 F.3d at 105); *see also Wright*, 360 F.3d at 1099; *Kuper v. Iovenko*, 66 F.3d 1447, 1459–60 (6th Cir. 1995) *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer,* 134 S.Ct. 2459 (2014); *Willett*, 953 F.2d at 1343–44).

---

[23] *See also Allison v. Bank One-Denver*, 289 F.3d 1223, 1239 (10th Cir. 2002); *Plasterers' Local Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 217 (4th Cir. 2011) (a fiduciary breach "does not automatically equate to causation of loss and therefore liability," so a "fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan"); *Willett v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1343 (11th Cir. 1992) ("Section 409 of ERISA establishes that an action exists to recover losses that 'resulted' from the breach of a fiduciary duty; thus, the statute does require that the breach of the fiduciary duty be the proximate cause of the losses claimed....").

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California  94111

SAFEWAY DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES; Case No: 3:16-cv-04903 JST
175908

### 2. Plaintiff has not established a causal link between any specific alleged breach and loss to the Plan.

Plaintiff generally alleges that it was imprudent for the Committee to select the JPMorgan TDFs. (Dkt. 66, ¶37.)  There is no evidence, however, that the Committee's process in selecting the JPMorgan target date funds was somehow flawed, or that any particular flaw in the Committee's process resulted in losses to the Plan.  Alleged losses to the Plan *resulting from* alleged breaches of fiduciary duty must be tied to a "specific imprudent investment decision or decisions." *Brotherston v. Putnam Investments, LLC*, No. CV 15-13825-WGY, 2017 WL 2634361, *11 (D. Mass. June 19, 2017) (*appeal docketed, July 20, 2017*).  Likewise, to support a claim for beach of ERISA's duty of *loyalty* (as distinct from the duty of prudence), Plaintiff must "point to specific circumstances in which the Defendants have actually put their own interests ahead of the interests of Plan participants." *Id.*, *8.  Plaintiff points to supposed alternative investments, but he does not point to any specific breach at any specific point in time caused the Plan to select or retain the JPM TDFs over better alternative options.  Instead, he assumes that the Committee's process, in the abstract, resulted in the alleged improper selection of the JPM TDFs.  In *Brotherston*, the Court concluded that similar claims had a "fundamental problem" due to the "broad sweep of the Plaintiffs' 'procedural breach' theory," because the plaintiffs merely argued that "the alleged lack of an 'objective process' by [the Committee] to monitor the Plan investments makes <u>the entire</u> investment lineup of the Plan imprudent." *Id.*, at *10 (emphasis in original).  The district court there rejected the plaintiffs' argument that they were "not required to prove that any individualized investment decision was imprudent because no individualized investment decisions were made," finding that "this argument lacks legal support." *Id.*

The same problem is present here:  Plaintiff merely provides general statements about the necessity to base selection on track record and purported alternative investments, but he does not provide any evidence that the Committee – at the time it made the decision to offer the JPMorgan TDFs as an investment option – acted unreasonably.  Because this theory ignores the necessary elements that Plaintiff *prove* that the Safeway Defendants breached their fiduciary duties and that this alleged breach *resulted in* losses to the Plan, this claim fails.

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California 94111

-12-

**B.**     **Plaintiff has not met his burden of proving the Committee followed an imprudent process in selecting the JPMorgan SmartRetirement Passiveblend funds.**

"When applying [ERISA's] prudence rule, the primary question is whether the fiduciaries, 'at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment.'" *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1074, 1114 (C.D. Cal. 2009) (*overturned on other grounds*) (citing *California Ironworkers Field Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001)). "Whether a fiduciary acted prudently cannot be measured solely from the perspective of hindsight; rather, the question is whether the fiduciary conducted himself in the appropriate manner and considered the appropriate factors when making his decisions." *Id.* (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 424 (4th Cir. 2007); *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1230 (N.D. Cal. 2008) ("Of course, the test of prudence is one of conduct and not performance....  It is easy to opine in retrospect that the Plan's managers should have made different decisions, but such 20/20 hindsight musings are not sufficient to maintain a cause of action alleging a breach of fiduciary duty.").

Here, there is no evidence suggesting that the Committee's process in selecting or retaining the JPM TDFs was imprudent.  The record shows the Committee carefully considered the selection of the JPMorgan TDFs over the course of several months, and based its decision to select these funds on ample information available to the Committee – including information presented by Aon – at the time the Committee made its decision to select these funds. (*See, e.g.*, Huss Dec., Exs. 27, 38, 40.) Once selected, it is undisputed and indisputable that the JPMorgan TDFs outperformed the BlackRock funds they replaced.

**1.**     **Plaintiff's purported expert David Witz does not provide support for his claim that the JPM TDFs were improperly selected.**

Plaintiff presents the expert report of purported expert David Witz, who opines that the Committee should not have selected the JPMorgan TDFs, and should have instead chosen other target date funds that Mr. Witz opines would have been superior alternatives.  (Huss Dec., Ex. 42 (Witz Report).)  Initially, Mr. Witz states that the JPMorgan target date funds were selected without a track record.  (*Id.*, ¶ 13-14.)  This statement is misleading, because JPMorgan – with an identical team of

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

fund managers – had a successful track record in its offering of similar target date investments.  (*See*, *e.g.,* Huss Dec., Ex. 43, pp. 7, 24, 46.)  The fact that the JPMorgan TDFs were recently offered by JPMorgan ignores the past performance of the other funds in the JPMorgan SmartRetirement target date series.

Further, Mr. Witz's analysis is premised entirely on what he claims were alternative target date funds the Committee could have chosen in 2010 or 2011 when the Committee selected the JPMorgan funds.  (Huss Dec., Ex. 42 (Witz Report), ¶¶ 35-39.)  He lists a number of funds – including the Principal Tr Target Z funds, the TIAA Lifecycle Funds, the Vanguard Trust 1 funds, Wells Fargo Target, State St. Target Ret, and the Blackrock funds that were already in the Plan – as supposed alternatives that he claims were less expensive and better performing than the JPMorgan funds.  (*Id.*, ¶¶ 36, 37.)  And, he states that JPMorgan offered a "CF" share class that were 20 bps less than, and "of course" performed better than the CF 20 share class of the JPMorgan target date funds that the Plan selected.  (*Id.*, ¶ 38.)  The CF share class offered no revenue sharing while the CF 20 share class paid 20 bps of revenue sharing to the recordkeeper.  Mr. Witz, however, presents no opinions about the Committee's process in selecting the JPMorgan funds, or that this process was somehow flawed, or that it was improper for the Plan to select target date funds that offered revenue sharing. (*Id.*)  As Plaintiff's cross-designated expert, Mr. Levy, agreed, "if you have an investment vehicle that has a share class with no revenue sharing and a share class that does provide revenue sharing . . . the investment merit, whatever it may be, of the two classes is the same."  (Huss Dec., Ex. 14 (Levy Depo.), p. 73:3-9.)

**2.  The record supports the conclusion that the Committee's decision to select the JPM TDFs was reasonable.**

Contrary to Plaintiff's assertion that the JPMorgan TDFs had no meaningful track record, these funds were part of the SmartRetirement target date series that consisted of other target dates funds that were established years before the SmartRetirement PassiveBlend Funds.  (Huss Dec., Ex. 43, pp. 7, 24, 46.)  In the 2010 to 2011 time period when the Committee was considering including the JPMorgan TDFs in the Plan's lineup, there were two target date funds in existence within the SmartRetirement target date series:  the JPMorgan SmartRetirement Mutual Fund which had an

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

-14-

inception date of May 15, 2006 (*i.e.* approximately two years before the inception of the SmartRetirement PassiveBlend Funds and five years before the Committee considered inclusion of a JPMorgan target date fund) and the JPMorgan Commingled Funds which had an inception date of August 1, 2005 (*i.e.* approximately three years before the inception of the SmartRetirement PassiveBlend funds and six years before the Committee considered inclusion of a JPMorgan target date fund). (*Id.* at p. 24)  In fact, by October 2011, there was over $11 billion in assets under management for the SmartRetirement target date series.  (*Id.*)  Over time, as more 401(k) plans held this group of target date funds, the amount of assets invested in this target date series reached over $54 billion as of 2015.  (Huss Dec., Ex. 45.)

Further, the JPM SmartRetirement PassiveBlend Funds were managed by a knowledgeable and experienced investment team, the JP Morgan Global Multi-Asset Group ("JPM Group") led by a senior portfolio manager with almost 20 years at JPMorgan and portfolio managers with 10 or more years of experience.  (Huss Dec., Exs. 43-45.)  Under the group's management, the SmartRetirement target fund series received numerous awards and industry recognition.  For instance, Morningstar repeatedly recognized the SmartRetirement target date series as a top target date fund series – in 2010, Morningstar ranked the series the second highest in value added over peer-group norm, as evaluated by cost, allocation, and selection and was one of only four providers with positive allocation in three areas; and received a "top" target-date fund series rating as of December 31, 2011.  (Huss Dec., Ex. 44 (42499).)  The SmartRetirement target date series also received Lipper Fund Awards: the SmartRetirement 2020 and SmartRetirement 2030 Funds received the 2010 Lipper Fund award, and the SmartRetirement 2050 Fund received the 2011 Lipper Fund award.  (*Id.*)  Standard & Poor's awarded the SmartRetirement 2015 Fund four stars for risk-management.  (*Id.*)  And, the JP Morgan SmartRetirement Portfolio Management Portfolio Management Team was nominated for the Morningstar U.S. Allocation Fund Manager of the Year in 2012 and 2014 and won the award in 2014.  (Huss Dec., Ex. 45.)

The JPMorgan TDFs also had similar investment philosophy, objectives, and glide paths as the other target date funds in the JPMorgan target date family, including those that were in existence prior to their inception in May 2008.  (Huss Dec., Exs. 43, 45.)  In particular, the JPMorgan TDFs had the

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

same investment philosophy and glide path as the SmartRetirement Mutual Funds which had an inception date of May 15, 2006 (i.e. two years before the SmartRetirement PassiveBlend Funds) except that certain assets within the SmartRetirement PassiveBlend Funds were passively managed. (*See* Huss Dec., Ex. 43 (42630); Ex. 45 (42408) (noting, all the funds in the series were "to" funds which means that the exposure to equity reaches the lowest point on the target date; in contrast, "through" funds do not reach the lowest equity concentration at the target date and the exposure continues to decrease past the target date).

The Committee's process in selecting the JPMorgan TDFs was objectively prudent and reasonable.  The Committee decided to select these funds (while rejecting other JPMorgan options) based on extensive, positive information that Aon presented to the Committee at the time it made its decision.  Plaintiff cannot carry his burden of proving that the Safeway Defendants breached their fiduciary duties in the selection of the JPMorgan TDFs, and, consequently, summary judgment should be entered on this claim in favor of the Safeway Defendants.[24]

### C.   Plaintiff presents no evidence that the Plan's administrative fees were unreasonable.

Plaintiff does not present any facts to support his claim that the recordkeeping fees paid through the JPMorgan TDF's revenue sharing component were unreasonable.  He appears to claim that the JPMorgan TDF revenue share component was limitless, and would increase continuously should the assets invested in the JPMorgan TDF increase.  This claim, however, ignores the fact that the revenue sharing was used to pay the Plan's recordkeeping fees, which were capped at a flat, per-participant rate.  And there is no evidence suggesting that this per-participant rate was unreasonable, or that the Plan fiduciaries could have obtained less-expensive recordkeeping services.  The Plan's recordkeepers never received compensation in excess of this flat per-participant fee. (Montalvo Dec., ¶6.)  Since there is no evidence that per-participant fee was unreasonable, summary judgment should be granted in favor of the Safeway Defendants.  Plaintiff portrays the revenue sharing fees paid by the

---

[24] Moreover, plaintiff Maria Terraza's expert, Martin Dirks, admitted that his report does not dispute the retention of the JPM SmartRetirement Passiveblend Funds after it was introduced into the Plan's lineup in 2011.  (Huss Decl., Ex. 47 (Deposition of Martin Dirks ["Dirks Depo."]) at pp. 219:12-220:15).

JPM TDFs as limitless (Dkt. 66, ¶45), but this is simply untrue.

### 1. The Committee renegotiated the flat fee to the benefit of participants.

Plaintiff also ignores that the Committee renegotiated the Plan's recordkeeping fees to lower costs to participants throughout the relevant time period.  The fee was originally $67 per participant annually, but was lowered to $65 in 2011 and then further lowered to $52 in April 2015.  (Montalvo Dec., ¶6.)  By leveraging the size of all of the affiliated Albertsons plans, the recordkeeping fees were ultimately lowered to $31 per participant when these plans moved to Vanguard.  (Huss Dec., Ex. 25 (Depo. Ex. 107).)  In the face of these facts, Plaintiff's claim these fees were excessive must fail.  *See White v. Chevron Corp.*, No. 16-CV-0793-PJH, 2016 WL 4502808, at *15 (N.D. Cal. Aug. 29, 2016), (dismissing similar claims after finding "the Plan fiduciaries did renegotiate their recordkeeping arrangement with [the plan's recordkeeper] to limit compensation to annual, per-participant fees."); *Johnson v. Providence Health & Servs.*, No. C17-1779-JCC, 2018 WL 1427421, at *7 (W.D. Wash. Mar. 22, 2018) ("Plaintiff's allegation that Defendants failed to competitively bid the recordkeeping is diminished by the fact that Defendants repeatedly renegotiated the agreement to the benefit of the Plan.").  The Plan's recordkeeping costs moved from $67 to $31 over the course of the relevant time period through renegotiation and competitive bidding.  (Montalvo, ¶6; Huss Dec., Ex. 25 (Depo. Ex. 107).)  So, his argument that the revenue sharing component, and, consequently, the recordkeeping fees paid by the Plan were excessive, is contradicted by the fact that the recordkeeping fees the Plan *decreased* during the relevant time period.

### 2. Plaintiff presents no evidence that the Plan paid unreasonable recordkeeping fees.

To show that the revenue sharing component associated with the JPMorgan TDFs resulted in excessive fees, Plaintiff would need to show that the administrative fees that were paid by this revenue sharing were excessive.  Plaintiff, however, has not met his burden of presenting evidence that the recordkeeping fees the Plan paid to JPMorgan and Great-West were unreasonable.  *See White,* 2016 WL 4502808, at *15 (dismissing a recordkeeping claim, in part, because "plaintiffs do not allege any facts showing that those renegotiated fees were unreasonable.").  Plaintiff's only possible argument to support this claim appears in the Report of Roger Levy in the *Terraza* matter – who Plaintiff in this

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California 94111

-17 -

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California 94111

matter cross-designated – which compares the JPM/Empower fees to the pre-acquisition Albertsons'

Fidelity fees. (Huss Dec., Ex. 15 (Levy Report), ¶89).  He states,

> Of course, the fact that the per participant fee paid by the Plan was so much higher than that negotiated as part of the RFP process (and significantly higher than the per participant fees paid by Albertsons' plans of similar size, participant numbers and participant balances, which paid $35 per participant for recordkeeping before the RFP process) [], establishes that the amount paid by the Plan for recordkeeping services was excessive in nature.

(*Id*.)  But the bidding process that resulted in these fees necessarily took the respective plans' assets and number of participants into account:  the Albertsons LLC and NAI plans were bid together, with combined assets of $3.2 billion and 51,853 participants (Huss Dec., Ex. 25; Ex. 26), whereas, at the time of the Albertsons acquisition, the Plan had $1.7 billion in assets and 37,100 participants.  (Huss Dec., Ex. 25; Huss Dec., Ex. 21, (2015 Form 5500) p. 2, (Notes), p. 5.)  And, once the Plans were combined for the purpose of the bid that resulted in Vanguard being selected at $31 per participant, the combined assets for that bid were nearly $5 billion (approximately 3 times more than the Safeway Plan's assets), with approximately 95,000 participants.  (Huss Dec., Ex. 25; Ex. 26.)

Moreover, Plaintiff's expert, Mr. Witz, and his cross-designated experts in the *Terraza* action do not touch upon the reasonableness of the Plan's recordkeeping fees in their reports (*see* Huss Dec., Exs. 15, 16, 42) except to note that the Albertsons plan paid lower fees.[25]  Even if it was appropriate to point only to the Albertson's plan as an appropriate indicator of what might be a reasonable recordkeeping fee, Mr. Levy acknowledged that he made no attempt to compare the services provided by the Albertson's recordkeepers to the services provided by the Safeway Plan's recordkeepers. (Huss Dec., Ex. 14, p. 55:17-25) (confirming that the only basis upon which he drew any conclusions was the RFP report attached to the Huss Dec. as Ex. 27, which provided only the pre-consolidation Albertsons Fidelity fees).  To the extent, therefore, that he has weighed in at all on the reasonableness of the Plan's recordkeeping expenses, his opinion is unreliable and therefore inadmissible.  *See* Motion in Limine to Exclude Expert Report and Testimony of Roger L. Levy filed concurrently in the related *Terraza* action.

---

[25] Mr. Levy further acknowledged that he has no "personal experience evaluating recordkeeping fees for plans with assets in excess of $1 billion" outside of this case.  (*Id.*, pp. 57:24-58:2.)

-18-

3.      **Plaintiff presents no evidence that more competitive bidding or renegotiation would have achieved lower administrative fees for the same services.**

There is no evidence that the Plan could have obtained less expensive recordkeeping fees through a greater amount of competitive bidding, for services comparable to those provided by the Plan's recordkeepers. Not even her experts engage in that speculation. Plaintiff therefore cannot meet her burden of proof with respect to this issue. *See White*, 2016 WL 4502808, at *14 ("plaintiffs do not even allege that a competitive bid would have benefitted the Plan or the Plan participants, because they do not allege any facts from which one could infer that the same services were available for less on the market," citing *Young v. GM Inv. Mgmt. Corp.*, 325 Fed. Appx. 31, 33 (2d Cir. 2009)); *Johnson*, 2018 WL 1427421, at *8 (dismissing a recordkeeping claim finding, "Plaintiff does not plausibly allege that another recordkeeper would have provided the same services at a lower cost" and citing *Young v*, 325 Fed. Appx. at 33, affirming the dismissal of an excessive recordkeeping fee claim where plaintiffs "fail[ed] to allege that the fees were excessive relative to the services rendered").

As Levy admits, per-participant recordkeeping fees for a larger plan are lower than those for a smaller plan, all other factors being equal. (Huss Dec., Ex. 14 (Deposition of Roger Levy ["Levy Depo."], p. 115:15-20.)   And, although he acknowledges that a proper analysis of recordkeeping expenses requires a comparison of the scope of services provided from plan to plan (see Huss Dec., Ex. 15 (Levy Report), ¶90); Ex. 14 (Levy Depo.), pp. 138:19-139:4), Levy did not compare the services provided by the Plan's recordkeeper with the services provided by the Albertson's plan recordkeeper. (Huss Dec., Ex. 14 (Levy Depo.), p. 103:17-23.) Likewise, Dirks engaged in no comparison of the services provided to the plans. Conversely, the Safeway Defendants presented the opinion of recordkeeping expert Steven Gissiner, who concluded that based on his "benchmarking analysis and review of the Safeway Plan, the Plan's total costs and administrative fees paid to JPMRPS and Great-West RPS were reasonable and well within the range of costs paid by comparable plans." (Huss Dec., Ex. 17 (Report of Steven Gissiner ["Gissiner Report"]), ¶16.)

Moreover, any assertion that the Committee did not send recordkeeping out to bid *enough* during the relevant time period is insufficient to support a breach of prudence claim. *See Sacerdote v. New York Univ.*, No. 16-CV-6284-KBF, 2017 WL 3701482, at *8 (S.D. N.Y. Aug. 25, 2017)

-19 -

1  (rejecting "plaintiffs['] attempt to support their claim by adding a series of assertions that alternative

2  recordkeepers … could have provided superior services at a lower cost," and agreeing with defendants

3  "this fact alone does not support imprudence," because "[i]f it did, the mere entry into the market of a

4  lower-cost and superior provider would lead to a breach of fiduciary duty. This is not the law.")

5  (internal citations omitted).  Accordingly, should Plaintiff argue that a lower per-participant fee could

6  have been obtained through a greater amount of competitive bidding, it would be to no avail.

7        **D.**    **Plaintiff's damages theory contradicts the Committee's investment policy, and is**
8             **premised on incomparable investment alternatives.**

9       An ERISA fiduciary can be found liable for fiduciary breach "only upon a showing of actual

10  harm."  *CIGNA Corp. v. Amara*, 563 U.S. 421, 444 (2011).  That is, "we have usually assumed

11  without comment that plaintiffs bear the burden of persuasion regarding the essential aspects of their

12  claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005); *see also Gross v. FBL Fin. Servs.,*

13  *Inc.*, 557 U.S. 167 (2009) ("Where a statute is 'silent on the allocation of the burden of persuasion,'

14  'the ordinary default rule [is] that plaintiffs bear the risk of failing to prove their claims.'") (citing

15  *Schaffer*); *Pioneer*, 858 F.3d at 1335 (finding that because ERISA is "silent on burden allocation, the

16  'ordinary default rule [is] that plaintiffs bear the risk of failing to prove their claims . . . because the

17  'burdens of pleading and proof with regard to most facts have been and should be assigned to the

18  plaintiff who generally seeks to change the present state of affairs and who therefore naturally should

19  be expected to bear the risk of failure of proof or persuasion.") (citing *Schaffer*, *supra*; 2 McCormick

20  on Evid. § 337 (7th ed. 2013)).  Accordingly, Plaintiff must persuade the Court that the Plan has

21  sustained damages as a result of alleged breaches of fiduciary duty.  His damages theory shows that he

22  cannot carry this burden.

23       Plaintiff merely presents a list of suggested alternative investments that his expert, David Witz,

24  claims had lower fees, longer track records, and were available in the marketplace in 2010 or 2011

25  when the Committee selected the JPMorgan target date funds.  (Huss Dec., Ex. 42 (Witz Report) at

26  ¶36.)  But he provides no evidence that the process whereby the Committee selected the JPMorgan

27  target date funds was unreasonable or improper, or does he carry his burden of proving that the

28  Committee actually *should have* selected any of these funds in the context of its decision to select the

Trucker ♦ Huss
A Professional Corporation
One Embarcadero Center, 12ᵗʰ Floor
San Francisco, California  94111

JPMorgan funds.  Moreover, his theory that the JPMorgan "CF 20" share class was not the least expensive share class that JPMorgan offered ignores the difference between these share classes.  The CF 20 share class provided 20 bps in revenue sharing, whereas the CF class did not.  The Committee decided to use revenue sharing to pay for Plan administrative expenses, which they were allowed to do. (Dkt. 58, p. 21) ("Revenue sharing arrangements are not per se prohibited under ERISA.").  It is specious to argue that the Plan offered a "more expensive" share class of the JPMorgan funds, when Mr. Witz should be aware that the Committee had the right to select funds that offered revenue sharing to offset administrative expenses.

## VI.    CONCLUSION

For the foregoing reasons, summary judgment should be granted in the Safeway Defendants' favor on each of Plaintiff's claims.

DATED:  July 6, 2018                         TRUCKER ✦ HUSS, APC


By:/s/R. Bradford Huss
R. Bradford Huss
Attorneys for Defendants
SAFEWAY INC., SAFEWAY BENEFITS PLANS
COMMITTEE, COMMITTEE MEMBERS

Trucker ✦ Huss
A Professional Corporation
One Embarcadero Center, 12th Floor
San Francisco, California  94111

-21-